61 S.W.3d 661 (2001)
In the Interest of R.G. and M.M., Children.
No. 10-01-007-CV.
Court of Appeals of Texas, Waco.
October 31, 2001.
*664 Guy K. Rodgers, Cleburne, for Appellant.
Melinda H. Sims, Asst. Solicitor General, Texas Attorney General Office, Austin, Shelly D. Fowler, Mary C. Davis, MacLean & Boulware, Cleburne, for R.G. and M.M.
Before Chief Justice DAVIS, and Justice VANCE and Justice GRAY.

OPINION
TOM GRAY, Justice.
Robert Gomez appeals the termination of his parental rights to his daughters, R.G. and M.M. Gomez complains that the evidence presented was legally and factually insufficient to support either of the alleged statutory grounds for termination of his parental rights. Gomez also complains that the evidence was legally and factually insufficient to support the finding that the termination was in the best interest of his children. We affirm the judgment of the trial court.

BACKGROUND
Gomez is the biological father of R.G. and M.M. The children's mother, Eloisa Maria Martinez, was killed in an automobile accident in 1993. Both children were in the car with their mother at the time of the wreck, and R.G. suffers from mental and physical difficulties as a result of the accident. From the time his wife died in 1993 until May of 1998, Gomez and the children lived primarily in his mother's home in Granbury, Texas.
Sometime in May, 1998, Gomez took both children to Dr. Stephen Bishop, who was Gomez's employer at the time, to verify allegations that his daughters were victims of sexual abuse by his brothers, Ramond Gomez and Johnny Joe Gomez. It is unclear exactly how and when Gomez learned of the possibility of the abuse. In a signed voluntary statement to law enforcement, Gomez stated that "in the last part of May, through the first part of July of 1998" the girls had told him of the abuse. According to this statement, the girls told him that their uncles had grabbed them and pressed up against them and that Johnny Joe had "put his thing (penis)" in R.G. In his brief, Gomez states that his second wife told him in May of 1998 that the girls had made an outcry of sexual abuse perpetrated by Ramond and Johnny Joe at the home of the girls' paternal grandmother. According to the statement that Gomez's second wife made to a law enforcement officer, however, Gomez *665 had known about the sexual abuse of both children for approximately three years. The record reflects that R.G. claimed that she had told her father and grandmother about the abuse, but that they had done nothing about it. According to Gomez's trial testimony, he wanted concrete proof ("paper proof or something") from the doctor that his children had been sexually abused, but Dr. Bishop did not tell him that the girls had definitely been assaulted.
In June 1998, Dr. Bishop made arrangements for Gomez to move with his children to an apartment in Godley, Texas. Gomez testified that he continued to take the girls to his mother's house because she was there by herself. However, R.G. told her school counselor that at least one more incident of sexual assault took place there after the move to Godley.
On the second day of school, August 13, 1998, R.G. made an outcry to a Godley school counselor, indicating that the sexual abuse of both her and her sister had been ongoing for years. She stated that both her father and grandmother were aware of it; in fact, her grandmother was in the house when the abuse occurred. R.G. described the most recent incident of abuse just several days prior. The counselor contacted Child Protective Services. A worker immediately took both children to the Advocacy Center, where they were interviewed on videotape. Both described how Ramond and Johnny Joe and their cousins sexually abused them at their grandmother's house. The girls were also taken to Cook's Children's Hospital for a sexual assault exam. Again, Gomez claims that he was told that there was no physical evidence of abuse. However, during cross-examination, Gomez was asked if he had been told that there had been sexual abuse by multiple perpetrators. He replied, "I believe she [the examining physician] said something like that." He also admitted that he was told by medical personnel that there may not be physical evidence in sexual assault cases, but that "I thought they had to have proof."
Child Protective Services removed the children from the Gomez home and placed them in foster care for twenty-four hours. The next day, Gomez signed a child safety plan that provided that he would keep his daughters away from his mother's residence and the town of Granbury and that he would cooperate with Child Protective Services in protecting his children. Child Protective Services learned that Gomez had violated the safety plan on at least three different occasions by taking the children to his mother's house. At first, the girls denied that they had been to their grandmother's house. R.G. also recanted her original outcry statement, but later that same day told her school counselor that she had recanted because she was concerned that if her uncles went to jail, her grandmother would have no one to care for her and would die. After speaking with her counselor, R.G. reconfirmed that the sexual abuse did occur and admitted that she had been at her grandmother's house since her father signed the safety plan. The next day, Child Protective Services removed the children from Gomez's home and placed them with a therapeutic foster home in Fort Worth, Texas. This was approximately one week after the two brothers were arrested for the sexual abuse of the children.
On October 14, 1999, a jury convicted Johnny Joe of aggravated sexual assault of a child and sentenced him to fifty years in prison. The jury also convicted him of two counts of indecency with a child, for which he was sentenced to fifteen years confinement. Gomez testified on behalf of his brother at the trial, as did several other family members. On November 2, 1999, *666 Ramond pled guilty to indecency with a child and was sentenced to ten years confinement. Gomez testified that he believes that his brothers were wrongly convicted, that he knows of no family members who believe that the abuse took place, and that members of his family are seeking to overturn both convictions.
Child Protective Services initially sought to reunite the children with their family. Approximately one year after becoming involved, Child Protective Services determined that one of the following permanency plans should be sought: (1) permanent placement with a relative and transfer of conservatorship, or (2) permanent placement with a non-relative in the form of adoption. As of November 16, 1999, however, Gomez was serving a seven-year prison sentence for a felony conviction of driving while intoxicated.[1] Child Protective Services had not designated a relative as a suitable placement for the children. Therefore, termination was sought to allow adoptive placement for the children. At the trial, the State alleged two possible grounds for the termination of parental rights: (1) knowingly placing or allowing the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child or (2) engaging in conduct or knowingly placing the child with persons who engage in conduct which endangered the physical or emotional well-being of the child. See Tex. Fam.Code. Ann. § 161.001(1)(D), (E) (Vernon Supp.1998). The State also alleged that it would be in the children's best interest to terminate their father's rights. See Tex. Fam.Code Ann. § 161.001(2) (Vernon Supp.1998). The court conducted a bench trial and found by clear and convincing evidence that Gomez had violated subsections D and E and that it was in the best interest of the children that Gomez's parental rights be terminated.

TERMINATION OF PARENTAL RIGHTS
We recognize the gravity of the termination of parental rights and appreciate the possible effects of its finality. As we stated in J.M.T.:
The natural right existing between a parent and child is of constitutional dimension. The right to raise one's child has been characterized by the United States Supreme Court as essential, as a basic civil right, and as a right far more precious than property rights. A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. Termination is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." (cites omitted).
In re J.M.T., 39 S.W.3d 234, 237 (Tex. App.-Waco 1999, no pet.).
Because of the drastic nature of involuntary termination under the provisions of Section 161.001 of the Family Code, we require the petitioner to establish two elements. First, petitioner must prove a culpable act or omission on the part of the parent under the first subsection of the statute. Tex. Fam.Code Ann. § 161.001(1)(Vernon Supp.1998). Second, *667 petitioner must prove that termination of the parent-child relationship is in the best interest of the child. Tex. Fam.Code Ann. § 161.001(2) (Vernon Supp.1998). Proof of one element does not relieve the petitioner of the burden of proving the other. Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976).

STANDARDS OF REVIEW
Legal sufficiency
We use the traditional "no-evidence" standard of review in considering a legal sufficiency complaint of a finding that must be established by clear and convincing evidence. We consider only the evidence that tends to support the findings and disregard all evidence and inferences to the contrary to determine if there is more than a scintilla of probative evidence in the record to support the decision. In the Interest of D.L.N., 958 S.W.2d 934, 936 (Tex.App.-Waco 1997, pet. denied, pet. rehear'g denied); Lucas v. Texas Dep't of Protective and Regulatory Services, 949 S.W.2d 500, 502 (Tex.App.-Waco 1997, writ denied). If there is any evidence in the record to support the finding of the trial court, we will overrule the appellant's legal sufficiency complaint. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951).
Factual sufficiency
To determine whether the evidence is factually sufficient, we consider all the evidence in the record both for and against the finding. In re A.P. and I.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet. h.). In reviewing an involuntary termination, we will find the evidence factually insufficient if the trier of fact could not reasonably find the existence of the fact to be established by clear and convincing evidence. Spangler v. Texas Dept. of Protective and Regulatory Services, 962 S.W.2d 253, 256 (Tex.App.-Waco 1998, no pet.). Clear and convincing evidence is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id. at 256. This court has adopted the clear and convincing standard of review because this intermediate standard is believed necessary to protect fundamental constitutional rights involved in termination of parental rights. Id at 257.

APPLICATION OF THE TWO PRONG TERMINATION TEST
Prong one: culpable act or omission
In order to terminate Gomez's parental rights, the State was required to allege and to prove at least one of the acts or omissions enumerated in the Family Code. Tex. Fam.Code Ann. § 161.001(1) (Vernon Supp.1998). As noted, the State alleged two possible grounds, subsections (D) and (E). Subsection (D) permits termination based upon a single act or omission, while subsection (E) requires a "course of conduct." In re M.J.M.L., 31 S.W.3d 347, 351 (Tex.App.-San Antonio 2000, pet. denied). Gomez states that there is no evidence that he "knowingly harmed his children or knowingly exposed them to the abusers" and that "the State cannot point to an act or course of continuing conduct by Mr. Gomez that truly endangered his children's physical or emotional well-being." We disagree.
It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being. See In re King, 15 S.W.3d 272, 276 (Tex.App.-Texarkana 2000, pet. denied). "Endanger" means "to expose to loss or injury; to jeopardize." Texas Dep't. of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Parental knowledge that an actual *668 offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded that risk. See In re Tidwell, 35 S.W.3d 115, 118 (Tex.App.-Texarkana 2000, no pet.).
Legal sufficiency of the evidence
To be legally sufficient, there must have been more than a scintilla of evidence that Gomez placed his children in an environment of potential sexual abuse. The evidence shows that Gomez knew of the children's claims of abuse by May of 1998, yet he continued to return them to their grandmother's house where the abuse allegedly took place. Gomez testified at trial and stated in a sworn statement that he was informed of the abuse by May of 1998. In that same statement, he said that his brothers lived at his mother's address. Testimony revealed that R.G. said that she told her father about the abuse, that he did nothing about it, and that the abuse continued. In her original outcry to her school counselor in August of 1998, R.G. stated that she had been abused at her grandmother's house just days before. Gomez's second wife informed law enforcement that R.G. claimed that she was assaulted during a visit to her grandmother's house on July 25, 1998. It is unclear whether R.G. was referring to one incident or two separate incidents; however, at least one assault allegedly took place after Gomez became aware of his children's claims. Gomez also admitted that he took the children back to their grandmother's house after he signed the safety plan in August of 1998, violating his agreement that he would cooperate with Child Protective Services to protect his children.
In considering the evidence in a light that supports the finding made by the trier of fact, we conclude that there is more than a scintilla of evidence that Gomez engaged in conduct that endangered the physical or emotional well-being of R.G. and M.M. From this evidence, it is clear that Gomez continued to place his children in a potentially dangerous environment after he learned of the children's claims of sexual abuse. We find that this evidence is legally sufficient to prove both of the grounds alleged for termination, and overrule Gomez's legal sufficiency challenge of the evidence supporting the first prong required to terminate his parental rights.
Factual sufficiency of the evidence
To determine if the evidence was factually sufficient, we review all of the evidence to determine if the court could reasonably have found that the facts at issue were established by clear and convincing evidence. Spangler, 962 S.W.2d at 259. Thus, we will determine if there is clear and convincing evidence that Gomez was aware of the children's claims of sexual abuse and that he placed them in potential danger after he learned of those allegations. Tidwell, 35 S.W.3d at 118.
As noted, there is conflicting evidence regarding when and how Gomez learned of the allegations of sexual abuse. The court viewed Child Protective Services' videotaped interview with both girls. In that interview, R.G. stated that her father knew of the abuse, indicating that he had been told more than once about the abuse by the brothers: "He gets real mad and starts cussing, but he don't telltell them anything, I guess `cause they are hishe's the most littlest." During that same interview, M.M. stated that her father and grandmother had looked at both girls' "privates" and found that R.G. was "cracked open ... a lot" and that she was "cracked open ... a little bit." R.G. told the counselor that she had told her father of the abuse a number of timesthe last time as recently as a few days before her outcry at school. Gomez's second wife *669 claimed that he had known of the abuse for as long as three years.
In his sworn statement, Gomez stated the children told him about the abuse at the end of May to the first part of July of 1998. At trial, he first testified that he did not know of any allegations until R.G. made her outcry to the school counselor and that he took R.G. to Dr. Bishop in May of 1998 because she was having problems urinating. He also claimed that his prior statement had been coerced. The detective who took Gomez's statement denied any coercion. Richard Hattox, the District Attorney who had prosecuted the brothers, testified that Gomez's statements to him were consistent with the sworn statement.
During later testimony, however, Gomez indicated that he took both children to the doctor in May of 1998 to verify that they had been sexually abused. District Attorney Hattox confirmed that Dr. Bishop had conducted a sexual assault examination of the children at that time. According to this version of Gomez's testimony, which is consistent with his sworn statement, Dr. Bishop said that he could find nothing wrong with the children. Because Gomez told the doctor that he had to find out for himself if the children had been sexually abused, Dr. Bishop agreed not to file a report with the proper authorities until Gomez could talk with his two brothers. Both subsequently denied that the abuse had occurred. When Gomez told Dr. Bishop that he "had got it straight with my brothers not to be around my girls," the doctor agreed not to file a report at all.
Gomez's statement that he was unaware of abuse allegations until August 1998, is inconsistent with his sworn statement, with the children's videotaped interview, and with his actions in May 1998, according to his own testimony. Furthermore, we find that there was clear and convincing evidence that Gomez was aware of the allegations of sexual abuse that his children made regarding his brothers before he took the girls to Dr. Bishop in May of 1998. We next determine if there is clear and convincing evidence that Gomez disregarded the danger to his children by returning them to his mother's house, where he knew that the abuse had allegedly taken place.
There is no doubt that Gomez knew that the abuse allegedly took place at his mother's house. According to his sworn statement, both of his brothers lived there. When he conducted his own investigation of the alleged abuse, the first person he spoke with after leaving the doctor's office was his mother: "I then went to my mother and told her what the girls had told me about my brothers. My mother said that there was no way because she watched them all the time. And that she would not have let my brothers get that close."
Gomez testified that he moved his children to another town and that his children were never around his brothers after he confronted them with the allegations of abuse. He did, however, admit that he had returned the girls to his mother's house during the summer of 1998: "I remember leaving the girls, but the boys weren't home." At another point in his testimony, Gomez states that during at least one visit, Ramond was in another part of the house while Gomez and the girls remained in the front watching television. Gomez also admits that he violated the safety plan by taking the girls to their grandmother's house, but that it was after the brothers had been arrested.
However, in R.G.'s outcry to her school counselor, she stated that her father had dropped her off at her grandmother's house just a few days prior, assuring her that nothing bad would happen. R.G. said that when she got in the car, she yelled at *670 her dad, telling him that something bad did happen. According to R.G., her father did not respond. Gomez's second wife reported to authorities that R.G. had told her that she had been sexually assaulted at her grandmother's house on July 25, 1998.
We find that there is clear and convincing evidence that Gomez returned the girls to his mother's house after he learned of the allegations of abuse. Whether or not the brothers were present at the time that Gomez left his children at his mother's house is irrelevant. The fact remains that he knowingly left the children in the home of the alleged perpetrators, in a place where sexual abuse had allegedly occurred in the past and where the children were vulnerable to potential abuse in the future. According to the children not only was their grandmother aware of the abuse that was taking place, she was in the house when it occurred. Therefore, while the grandmother was not a potential threat to the children per se, she had allegedly been unable to protect them from abuse in the pastand Gomez was aware of that.
Therefore, having reviewed all of the evidence, we find that the evidence is factually sufficient to prove both grounds for termination.[2] We thus overrule Gomez's factual sufficiency challenge of the evidence supporting the first prong required to terminate his parental rights.
Prong two: best interest of the child
There is a strong presumption that the best interest of children will be served by preserving the parent-child relationship. Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.1976). Thus, the party seeking to deprive the natural parent of parental rights must also establish this second element by clear and convincing evidence. Herrera v. Herrera, 409 S.W.2d 395, 396 (Tex.1966). Again, however, in reviewing a legally insufficient complaint, we apply the traditional no-evidence standard. In the Interest of D.L.N., 958 S.W.2d 934, 936 (Tex.App.-Waco 1997, pet. denied).
The Texas Supreme Court has recognized several factors that may be considered in determining when termination is in the best interest of the child. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976). These include: the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger of the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the child's best interest; the plans for the child by the party seeking custody; the stability of the home or proposed placement; the act/omission of the parent which may indicate that the existing parent-child relationship is not proper; and any excuse for the acts/omissions of the parent. Id. No single consideration is controlling. However, the analysis of one factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. Furthermore, evidence of "sexual abuse is a significant factor in determining whether termination is in the best interest of the child." Green v. Tex. Dep't of Protective and Regulatory Servs., 25 S.W.3d 213, 221 (Tex.App.-El Paso 2000, no pet.). In Green, the court affirmed the termination of a mother's parental rights as being in the best interest of her child in light of evidence that the mother continued contact with her husband, who sexually abused her daughter.
*671 Legal sufficiency of the evidence
The State argues that the evidence introduced at trial supports the determination that termination is in the best interest of the children. Specifically, the State contends that the Gomez family's difficulty in accepting that the two brothers sexually abused the children can be harmful in the future. Gomez testified that he believed that his brothers were wrongfully convicted and actually testified on behalf of Johnny Joe at his brother's criminal trial. Family members are actively working to appeal both convictions. As noted, there is evidence that Gomez continued to take his children to their grandmother's house, instead of engaging in a course of action to protect them from further abuse. The court heard testimony from a social worker that such lack of support from Gomez could result in the children not reporting future abuse by the same individuals or new individuals.
The court also heard testimony that the children were undergoing various behavioral problems associated with the abuse. Among other things, both children have exhibited sexual behavior such as public masturbation and inappropriate sexual language. The social worker further expressed concern that the Gomez family will not be able to provide the emotional support that these children will need because they do not believe that the children were sexually abused by the brothers. For example, there was evidence that family members had pressured the girls to recant by telling them that their grandmother would die as a result of their actions.
Under the traditional no-evidence standard, this evidence is legally sufficient to support the court's ruling because it is probative of the inability of Gomez to provide the necessary emotional support for the girls and of Gomez's acts and omissions that tend to support a finding of an improper parent-child relationship.
Factual sufficiency of the evidence
Gomez asserts that the evidence is factually insufficient to support the finding that termination is in the children's best interest because these children want to be with their father. Specifically, Gomez states in his brief that the record contains "innumerable references to the children's bond with their father." He contends that the children sent letters and pictures to him during their placement with the foster family, that they had to be "heavily medicated" to control their depression and anxiety as a result of being separated from him, and that they exhibited suicidal tendencies because they were afraid that they would not see their father again.
Gomez's contentions are simply not a complete summary of the court's record. The children are reported to be bonded with their father, with the record indicating that in the past both have expressed a desire to see and live with their father. As the State points out, however, that bond seems to be weakened by the children's recognition that their father did not protect them. For example, in one of her letters to her father, R.G. told him that she was ashamed of him and was angry with him for not protecting her and her sister. M.M. told her foster parents that if her mother had been alive, the abuse would not have happened. The record confirms that both children are on a variety of medications. For example, R.G., who suffers from hallucinations of her deceased mother, has been treated with psychotropic medications. M.M. has been treated with medications for Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and Adjustment Disorder with Anxiety. While there is evidence that these children have suffered separation anxiety, there is nothing in the *672 record that attributes their emotional or psychological problems solely to the separation from their father. Evidence indicates that the death of their mother is also a contributing factor. Regarding the suicidal tendencies of both girls, the record does not reflect that M.M. ever exhibited such tendencies or thoughts. The record does indicate that R.G. has talked about suicide and even threatened to commit suicide. When R.G. learned that her father had again been put in jail, she grabbed a kitchen knife, held it to her chest, and stated that she wanted to die. However, according to the record, R.G. typically spoke of suicide as a means of being with her mother, not as an expression of fear that she would never see her father again.
The desires of the children are just one factor. Even if we determine that these children truly want to be returned to their father when he is released from jail, such a preference is not enough to resolve the issue of the best interest of the children. See In re Cassey D., 783 S.W.2d 592, 596 (Tex.App.-Houston [1st Dist.] 1990, no pet.). Other factors support a finding that termination is in the best interest of the children under the heightened standard of review.
The court heard testimony that the Gomez family does not believe that the girls were sexually abused by the brothers. This is evidenced by the fact that members of the family are actively working for the release of the brothers from prison. The record also reflects that the family has a history of pressuring the children to recant and of making the children feel responsible for the arrest of the brothers and, as noted, for the potential death of their grandmother. Gomez testified that the best placement for his children, if not with him, was with either his sister Beatrice, whose husband had been arrested for domestic violence, or with his sister Sally, who is financing the appeal of the convictions. Child Protective Services completed home studies on the families of both sisters and found both to be inappropriate placements for these two children.
Gomez himself would not state that he could believe his children without medical evidence. The State presented evidence that he disregarded the potential risks of future sexual abuse to his daughters by returning them to their grandmother's house, where he knew that such abuse had allegedly taken place. Because Gomez subjected his children to potential physical and emotional danger in the past, several witnesses expressed concern that Gomez would again place these children in danger.
In his brief, Gomez concedes that it is not in the best interest of the children to live with him. We agree. Moreover, there is sufficient evidence that it is not in the best interest of the children to return them to the Gomez family environment. The record indicates that the children's current therapeutic foster placement should be continued to meet their physical, emotional, and educational needs. Thus, the evidence is sufficient to produce in the mind of the fact finder a firm belief that (1) the already fragile emotional well-being of the children will be compromised by returning them to an environment where they are perceived as liars; (2) Gomez's plans for alternative placement with his family members are inappropriate and could potentially endanger the children emotionally or physically; and (3) Gomez's continued doubts that his children were sexually abused affords him an excuse to ignore danger to his children, further establishing an improper parent-child relationship. Therefore, we find that the evidence is both legally and factually sufficient to establish that termination was in the best *673 interest of the children and overrule Gomez's third issue.

CONCLUSION
Having overruled Gomez's three issues, we affirm the trial court's judgment of termination.[3]
NOTES
[1] During the time that Gomez had possession of his daughters, he was on probation for a felony DWI. After the children were removed from his home, his probation for that offense was revoked as a result of a new DWI. Gomez pled guilty to the new offense and pled true to a Motion to Revoke and was sentenced to a total of seven years in the penitentiary. His mandatory discharge date was set for October 9, 2001.
[2] The State has also argued that Gomez repeatedly driving while intoxicated is another course of conduct the supports termination. Because of our disposition, we do not need to decide that issue.
[3] At the end of his brief, Gomez suggests that designating Child Protective Services and Gomez as joint managing conservators without terminating his parental rights would be in the best interest of the children. Having made no prior references, citations, or arguments regarding the issue of joint conservatorship, he requests that we remand this case to the trial court for a determination on visitation and conservatorship. We will not address this suggestion for several reasons: (1) this request seems to contradict Gomez's trial testimony and the rest of his brief; (2) this issue is inadequately briefed (See Cavender v. State, 42 S.W.3d 294 (Tex.App.Waco 2001, no pet.)); and (3) this issue is moot because we have determined that the evidence supports the finding that termination of parental rights is in the best interest of the children.