NO. 07-04-0010-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

JUNE 14, 2004
_____

IN THE INTEREST OF H.B. AND B.P., CHILDREN
_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 66130-D; HON. DON EMERSON, PRESIDING
_____

*Memorandum Opinion*
_____

Before JOHNSON, C.J., and QUINN and CAMPBELL, JJ.

Appellant Jennifer Brown appeals from an order terminating her parental rights to her two minor daughters, H.B. and B.P.[1] In doing so, she challenges the sufficiency of the evidence to support the termination order. That is, she contends that the evidence is insufficient to support the findings that 1) she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, and 2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. We affirm the order of termination.

---

[1]The parental rights of the fathers of H.B. and B.P. were also terminated, but they did not appeal.

***Law***

The standards of review applicable to claims of legal and factual sufficiency are discussed in *In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002) and *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). We will not reiterate them but refer the parties to those opinions. It is not clear whether Jennifer is asserting both legal and factual sufficiency challenges. However, if the evidence is factually sufficient, then it is also legally sufficient because there cannot be "no evidence" of record if the record contains enough evidence to enable the factfinder to reasonably form a firm belief or conviction as to the existence of pivotal facts. *In re D.S.A., E.E.A. and O.J.A.,* 113 S.W.3d 567, 569 (Tex. App.–Amarillo 2003, no pet.). And, that is the question we address below.

Next, the decision may be affirmed if the evidence supports the existence of one statutory ground, assuming the State also proved that termination was in the best interest of the children.[2] *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.–Amarillo 2003, no pet.); *see* Tex. Fam. Code Ann. §161.001(1) &(2) (Vernon 2002) (stating that termination may be ordered if the trial court finds, by clear and convincing evidence, the existence of a statutory ground and that termination is in the best interest of the child). One of the statutory grounds alleged to support the termination at bar was that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child. Tex. Fam. Code Ann. §161.001(1)(D) (Vernon 2002). Next, the concept of endangering a child contemplates more than the threat of metaphysical injury or the possible ill effect of less

---

[2]Jennifer did not contest the finding that termination was in the best interest of the children.

2

than an ideal family life. *In re P.E.W.*, 105 S.W.3d at 777. But, it does not require proof of an actual injury to the child, or even a concrete threat of injury. *Id.* The child need only be exposed to loss or injury or have his physical or emotional well-being jeopardized. *Id.* Finally, unsanitary conditions can qualify as surroundings that endanger a child. *In re C.L.C.*, 119 S.W.3d 382, 392-93 (Tex. App.–Tyler 2003, no pet.); *see also In re P.E.W.*, 105 S.W.3d at 777-79 (considering the unsanitary conditions of the home, *e.g.* cockroaches, dirty dishes and floors, food on the floor, and an un-flushed toilet, as a factor in determining whether to terminate the parent-child relationship); *In re K.M.B.,* 91 S.W.3d 18, 24 (Tex. App.–Fort Worth 2002, no pet.) (holding that the presence of roaches, lice, animal feces, terrible odors and general filth as well as an admission that the children were left with incapable child care supported a finding that the children's well-being was endangered). So too can the awareness of a potential risk to the child of sexual abuse result in termination if the risk is ignored by the parent. *In re A.B.*, 125 S.W.3d 769, 775-76 (Tex. App.–Texarkana 2003, pet. denied); *In re R.G.,* 61 S.W.3d 661, 667 (Tex. App.–Waco 2001, no pet.).

### *Application of Law*

Jennifer had a history with the Texas Department of Protective and Regulatory Services (the Department) since June of 2000. Tifphany Hill, a caseworker for the Department, testified that H.B. and B.P. (approximately four and two years of age, respectively, at the time of trial) were removed from the home of Jennifer in August 2002 as a result of her visiting it and attempting to obtain entry for 45 minutes. During that time, she heard children inside the apartment but no one responded to her knocking. Eventually

3

she gained access through the apartment manager. When she entered, she observed H.B. standing in front of the sofa and B.P. in a soiled playpen crying. She yelled out in effort to determine if an adult was present. No one responded. Hill did finally locate Jennifer asleep in the bedroom with a male companion. Upon Hill's third request for Jennifer to rouse herself, Jennifer complied.

There was animal urine and feces in the apartment. One of the children was seen walking barefoot in it. Another child had a bottle of curdled milk. There were also dirty dishes present. So too were flies everywhere; some attempted to alight on the faces and in the mouths of the children. One of the children was also seen to be unclean and wearing clothes that did not match the child's size; this led Hill to believe that the youth dressed herself. The other child wore, as previously mentioned, a soiled diaper. Furthermore, the children had access to a tattoo gun with needles, spray painted towels, paints, cigarette lighters, cigarette butts, and cereal resting in a bowl on the floor, which cereal was apparently meant for the dog.

Amber Gibson, the stepmother of one of Jennifer's older daughters, also confirmed that "95 percent" of the time she went to pick up her stepdaughter there were dirty clothes everywhere. On one occasion, when Gibson arrived to take the child, the dirty clothes were stacked inside a closet "about four foot deep." And, when she asked Jennifer to give her clothes for the child, Jennifer simply reached into the stack and handed her dirty items. Also seen by Gibson were dishes piled in the sink for several days. Bottles of curdled milk would be lying on the floor. Trash and toys would be strewn about. H.B. was "often dirty" and her hair would be matted to her head. And, Gibson's stepdaughter "at times . . . would come to [her] house with caked dirt around her mouth and in her hands and on her scalp."

4

Mary Floyd, the grandmother of another of Jennifer's older daughters (and now that child's managing conservator) testified that Jennifer had in the past left her granddaughter with an individual named Hugh for three days without enough food or clothing. Jennifer would also leave the child with Floyd for extended periods of time without attempting to contact the girl. Next, according to Floyd, Jennifer's "house was . . . beyond dirty from one end to the other." And, often Floyd's grandchild would be dirty when she arrived to pick the girl up.

When called to testify, Glenda Joan Maxwell said that Jennifer would leave all her children on multiple occasions and for extended periods (*e.g.* three or four days) with Maxwell's brother, Hugh. The latter had a mental handicap and was considered to be "[l]ow functioning." Furthermore, Maxwell was not aware of Hugh having any type of training to care for children. Maxwell also informed Jennifer of rumors that Hugh "had touched her girls inappropriately." And, on one occasion the girls were found, in Hugh's house, only in panties or towels. Because of the rumors, Jennifer was asked to stop leaving her children with him. The request went unheeded. Jennifer continued to take the girls to his house. Eventually, Hugh was indicted or charged with indecency with children.[3]

Continually exposing the children to unsanitary living conditions, allowing them to remain physically dirty, allowing them to be cared for over extended periods of time by a "low functioning" mentally handicapped person who lacked training in the area of child care, failing to provide for the children when left with Hugh for extended periods, and ignoring the warnings about their exposure to potential sexual abuse constitutes ample

---

[3]Jennifer denied that she was aware of any concerns that Hugh may have sexually molested children at the times she left her offspring with him.

evidence entitling a reasonable factfinder to form a firm belief or conviction that Jennifer knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered the physical or emotional well-being of H.B. and B.P. This is so despite Jennifer's denial that she had any weaknesses in her parenting skills. Consequently, there is both legally and factually sufficient evidence to support the trial court's finding that §161.001(1)(D) of the Texas Family Code had been satisfied.

Having found the evidence sufficient to support termination under §161.001(1)(D), it is unnecessary for us to address the other statutory ground upon which termination was based. Accordingly, we overrule Jennifer's contention and affirm the order of termination.


Brian Quinn
Justice