# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-05-00761-CV

---

**Patricia Marie Fox, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE COUNTY COURT AT LAW OF BASTROP COUNTY,
NO. 04-9222, HONORABLE BENTON ESKEW, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Patricia Marie Fox appeals a judgment terminating her parental rights to three children, daughters B.R.F. (born 1995) and J.C.F. (born 1998), and son B.J.F. (born 1997). For the reasons stated below, we will affirm the judgment of the trial court.

### BACKGROUND

The underlying facts center on the sexual abuse of the two daughters by Joe James Fox III, the children's father and Patricia Fox's husband at the time, who subsequently pleaded guilty to aggravated sexual assault, *see* Tex. Pen. Code Ann. § 22.021 (West 2003 & Supp. 2005), and whose parental rights to all three children were terminated in a separate proceeding. Contending that Patricia Marie Fox knowingly permitted or even condoned Mr. Fox's sexual abuse of his daughters,

the Department of Family and Protective Services brought the present proceeding to terminate Ms. Fox's parental rights.

The trial court submitted to the jury, with respect to each child, the question: "Should the parent-child relationship between Patricia Marie Fox and [the child] be terminated?" and instructed the jury concerning two of the alternative statutory termination grounds: (1) whether "Patricia Marie Fox knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well being of the children," *see* Tex. Fam. Code Ann. § 161.001(1)(D) (West 2002 & Supp. 2005), and (2) whether "Patricia Marie Fox engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well being of the children." *See id.* § 161.001(1)(E). The court further instructed the jury that to find termination, "ten or more of you must find that at least one of the . . . grounds have been proven by clear and convincing evidence" and "[a]ll ten jurors must agree on the same ground or grounds." The court also instructed the jury that "[i]n addition, it must be proven by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children," and instructed the jury concerning various factors to consider in determining best interest.

The jury found that Ms. Fox's parental rights to each child should be terminated, and the trial court rendered judgment on that verdict. This appeal followed.

**DISCUSSION**

Ms. Fox brings four issues on appeal, asserting that: (1) the trial court violated her due process rights by submitting the ultimate issues of termination in broad form; (2) the trial court

erred by permitting the State to waive opening statement—which, she contends, "impermissibly allowed the burden of proof to be shifted to appellant"; (3) the evidence was not legally sufficient to support the jury's findings regarding the two termination grounds or that termination was in each child's best interest, *see id.* § 161.001(2); and (4) the evidence was not factually sufficient to support the jury's findings.

We begin with Ms. Fox's first two issues. Her first issue regarding broad-form submission of termination questions is controlled by *Texas Department of Human Services v. E. B.*, 802 S.W.2d 647 (Tex. 1990), in which the Texas Supreme Court squarely rejected the arguments Ms. Fox makes here. In *E.B.*, the Court approved submission of a single broad-form question incorporating two statutory grounds for termination of parental rights submitted disjunctively, holding that the "controlling question . . . was whether the parent-child relationship between the mother and each of her two children should be terminated, not what specific ground or grounds under [the statute] the jury relied on to answer affirmatively the questions posed." *E.B.*, 802 S.W.2d at 649; s*ee also Taylor v. Texas Dep't of Protective and Regulatory Servs.*, 160 S.W.3d 641, 649 n.8 (Tex. App.—Austin 2005, pet. denied); *In re J.M.M.*, 80 S.W.3d 232, 249-50 (Tex. App.—Fort Worth 2002, pet. denied) (absent contrary evidence, we presume that jury followed trial court's instructions that same ten or more of them must agree on verdict and all answers made). Unless and until the supreme court tells us otherwise, we must continue to overrule these types of complaints. We overrule Ms. Fox's first issue.

In addition, we find nothing erroneous about the State's waiver of its right to give an opening statement, much less any support for the proposition that this waiver somehow shifted the

3

burden of proof to Ms. Fox. Moreover, the trial court and the parties consistently emphasized to the jury from voir dire through closing argument that the burden of proof rested on the State, and the jury charge clearly articulated the same.[1] We overrule Ms. Fox's second issue.

**The evidence**

We now address Ms. Fox's third and fourth issues and consider whether the record contains legally and factually sufficient evidence to support the jury's findings of each submitted termination ground and best interest.

### *Standard of review*

In appeals of parental termination cases, we review the legal and factual sufficiency of the evidence in a manner that accommodates the clear and convincing standard of proof that governs such cases. *See* Tex. Fam. Code Ann. § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 264-65 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). When reviewing the legal sufficiency of the evidence to support a termination finding, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.F.C.*, 96 S.W.3d at 266. In so doing, we presume that the fact-finder settled disputed facts in favor of the finding if a reasonable fact-finder could do so. *Id*. We disregard all evidence that a reasonable fact-finder could have disbelieved or found incredible. *Id*.

---

[1] Nor did the State's waiver of opening statement change the order of proceedings at trial—the State was given the right to open and conclude the presentation of evidence and closing argument. *See* Tex. R. Civ. P. 265, 266, 269.

When reviewing the factual sufficiency of the evidence supporting a termination finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's finding, is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *C.H.*, 89 S.W.3d at 27-29. Further, we consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

As with all sufficiency challenges, we begin with the jury charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003) (factual sufficiency); *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.). Consistent with section 161.001 of the family code, the charge required the jury, in order to find that Ms. Fox's parental rights should be terminated as to each child, to first find at least one of the two submitted statutory termination grounds, then to determine that termination was in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)-(2).

***Termination grounds***

As previously noted, the jury was instructed that it could terminate Ms. Fox's parental rights if at least ten jurors agreed either (1) that Ms. Fox knowingly placed or knowingly allowed each child to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, or (2) that Fox engaged in conduct or knowingly placed each child with

persons who engaged in conduct which endangers the physical or emotional well-being of the children. *See id.* § 161.001(1)(D)-(E). Under subsection (D), the danger to the child results from the child's environment, while under subsection (E), a person's conduct is the source of the danger to the child. *In re D.C.*, 128 S.W.3d 707, 715 (Tex. App.—Fort Worth 2004, no pet.); *Robinson v. Texas Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Regarding both grounds, the jury was instructed that "[s]exual abuse is conduct that endangers a child's physical or emotional well-being" and that "[t]he aggravated sexual assault of a child in the home is conduct you may infer will endanger the physical or emotional well being of other children in the home." *See In re R.G.*, 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.); *In re King*, 15 S.W.3d 272, 276 (Tex. App.—Texarkana 2000, pet. denied). "Endanger" was defined as "to expose to loss or injury, to jeopardize," and "[i]t is not necessary that the conduct be directed at the child or that the child actually suffers injury." The jury was further instructed that "knowingly" means "with knowledge, consciously, intelligently, willfully, intentionally," and "with awareness of the nature of her conduct," and that "[p]arental knowledge that an offense has occurred is not necessary . . . it is sufficient that a parent was aware of the potential for danger and disregarded that risk." *See In re A.B.*, 125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied); *In re Tidwell*, 35 S.W.3d 115, 118 (Tex. App.—Texarkana 2000, no pet.).

There is no dispute that Mr. Fox committed aggravated sexual assault against both B.R.F. and J.C.F. Thus, whether the State established either termination ground turned on whether there was clear and convincing evidence that Ms. Fox, at a minimum, knew of a risk that B.R.F. or J.C.F. would be subjected to sexual abuse by their father and disregarded that risk. The State

6

presented several witnesses who testified that the children had divulged that Ms. Fox actually knew about Mr. Fox's sexual abuse of B.R.F. and J.C.F., yet acquiesced in it. This testimony included:

- Mindy Graber, a forensic interviewer for the Children's Advocacy Center who interviewed all three children, recounted that then nine-year-old B.R.F. told her that she had informed her mother about the abuse. She also testified that then five-year-old J.C.F. told her that she had told her mother many times about the abuse, and that her mother had even observed the abuse on one occasion:

  Q: And what, do you remember, did she say about mom in that interview? Did she say anything about her?

  A: Well, when I first asked her she said—she said mom, no, she didn't see. And I didn't tell her. And then like a minute later she walked over to my chair and she tapped my arm and she said, I'm sorry, I lied. And then said, I told my mom I touched dad's weenie, were her words, and she said, I told her lots of times. I don't remember how many times I told her. And when I asked if she had ever seen them, she said that she saw her under the blanket.

  Q: Who's she? I'm sorry?

  A: [J.C.F.] said that mom saw her in between his legs under the blankets and [mom] said, "Awe, someone loves you."

- Officer Lee Nussbaum, an investigator with the Crimes Against Children division of the Bastrop County Sheriff's Office, testified regarding his investigation of the sexual abuse reports. Nussbaum observed Graber's interviews with the children. He testified regarding B.R.F.'s statements to Graber:

  She said when the abuse was occurring when she was five she had told her mother what he had done to her, and she said that her mother yelled at Joe and threw things at him. So that's why, according to her, she said that's why she didn't tell mom about this time because mom wouldn't do anything but yell at him and throw stuff at him.

- Officer Nussbaum also reviewed J.C.F.'s videotaped interview with Graber and testified regarding J.C.F.'s statements:

7

Q: And so did [J.C.F.] indicate at all if mother knew?

A: If the mother knew?

Q: Do you know?

A: J.C.F. stated she's told her mom several times. She states her mom says that it is okay, and she states this is the truth.

- Johanna Fite, the school nurse at the elementary school that the three children attended, testified regarding then five-year-old J.C.F.'s initial outcry to her and the investigation that ensued after Fite reported the outcry to Child Protective Services. During this investigation, B.R.F. also admitted to Fite that she had been sexually abused. When Fite asked B.R.F. why she had not let her mother know what was happening, B.R.F. told her "that she did, that nothing ever happened, and that her mom would just get mad and yell and throw things at her father."

- Fite also testified that while B.R.F. was being questioned at the school by CPS, she attempted to use Fite's telephone to call her mother. B.R.F. indicated that she had been instructed to call her mother if the children were ever questioned by CPS. Fite further recounted that before Mr. Fox's sexual abuse was revealed, Ms. Fox had previously attempted to portray B.R.F. to her as a liar. From these facts, Fite inferred that Ms. Fox had known of Mr. Fox's sexual abuse and was anticipating the need to respond if B.R.F. ever disclosed the abuse to Fite or others.

- Leslie Smith, a licensed family therapist, testified that B.J.F., the girls' brother, told her that he had seen his father in the bathroom touching his sisters and that he told his mother about the touching.

- Beth Nauert, a pediatrician who medically diagnosed the sexual abuse, testified that J.C.F. told her that "Mommy knew" about the sexual abuse because she was present in the bedroom one time when it happened.

- Dr. Michael McNeil, a psychologist who interviewed the children, testified that the children told him that their mother knew about the abuse. McNeil also testified that B.R.F. told him that the abuse stopped for about a year because her mother had discovered the abuse and confronted the father about it.

8

On the other hand, there is also evidence in the record that Ms. Fox did not become aware of the abuse until after the children's outcry and the subsequent investigation:

- During the investigation and at trial, Ms. Fox consistently denied having knowledge of her husband's sexual abuse while it was occurring.

- Ms. Fox testified that if B.R.F. had told her about the abuse, Ms. Fox "did not understand what she was saying."

- Officer Nussbaum testified that during his interview with Mr. Fox, Mr. Fox had maintained that his wife was not aware that he was sexually abusing their daughters.

- Janice Evans, a friend of Ms. Fox, testified that she did not believe Ms. Fox knew about the abuse.

- The Court-Appointed Special Advocate appointed to the case, Samantha Krenek, admitted that when the children's attorney ad litem had brought B.R.F. into the courtroom to discuss her upcoming testimony with her, with Krenek present, B.R.F. had expressed reluctance to testify and even appeared to recant her previous statements that her mother had knowledge of the abuse.

However, Ms. Fox admitted to knowing facts that reasonable jurors could have viewed as warning signs of possible child abuse. She acknowledged Mr. Fox's practice of having his daughters rub lotion on his feet and bare back after he came home from work; Ms. Fox did not believe this was inappropriate behavior. There is also evidence that Ms. Fox had caught Mr. Fox looking at child pornography on his home computer. As for B.R.F.'s attempts to recant her accounts that her mother knew about the abuse, Krenek suggested that B.R.F. had recanted because B.R.F. realized that the only way to return home to her mother was to change her story.

Viewing this disputed evidence in the light most favorable to the jury's findings, we conclude that a reasonable fact-finder could have settled the disputed facts in favor of the findings

and could have formed a firm belief or conviction that Ms. Fox, at a minimum, knew of a risk that her children would be subjected to sexual abuse by their father and disregarded that risk. The evidence is thus legally sufficient to support the jury's findings regarding child endangerment. *See* Tex. Fam. Code Ann. § 161.001(1)(D)-(E); *J.F.C.*, 96 S.W.3d at 266. We also find the evidence factually sufficient to support these findings. Considering the evidence as a whole, the jury reasonably could have reconciled the disputed evidence in favor of its finding and reasonably formed a firm belief or conviction that Ms. Fox knew of a risk that her children would be subjected to sexual abuse by their father.[2] *See C.H.*, 89 S.W.3d at 27.

### Best Interest

The jury was instructed that "[s]ome factors to consider in determining best interest are:

(1)   the desires of the child or children;

(2)   the child's age and physical and mental vulnerabilities;

(3)   the frequency and nature of out of home placements;

(4)   the magnitude, frequency, and circumstances of harm to the children;

---

[2]  In the alternative, we hold that the evidence was legally and factually sufficient to support the jury's findings regarding at least one of the two submitted termination grounds. Even if the evidence was insufficient to support one of the grounds, the other ground, along with a finding of best interest, would still support the verdict and judgment under the court's broad-form submission of the controlling termination issue. *Cf. In re J.F.C.*, 96 S.W.3d 256, 284 (Tex. 2002); *Taylor v. Texas Dep't of Protective and Regulatory Servs.*, 160 S.W.3d 641, 648 (Tex. App.—Austin 2005, pet. denied).

(5)    whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(6)    the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members or others who have access to the home;

(7)    whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the home;

(8)    whether there is a history of substance abuse by the child's family or others who have access to the home;

(9)    the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(10)    whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family care with:

    (a)  minimally adequate health and nutritional care;

    (b)  care, nurturance, and appropriate discipline consistent with the child's physical and psychological needs;

    (c)  guidance and supervision consistent with the safety of the child;

    (d)  a safe physical home environment;

    (e)  protection from repeated exposure to violence even if the violence is not directed at the child; and

    (f)  an understanding of the child's needs and capabilities.

*See Taylor*, 160 S.W.3d at 646 (citing *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976)) (factors are not exhaustive and other factors may be considered when appropriate). The absence of evidence about some factors will not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. The sole

focus of our inquiry is the best interest of the child, not the parent. *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ).

The evidence is legally and factually sufficient to support the jury's finding that termination is in the best interest of the children. In addition to the evidence that Ms. Fox knew of her husband's sexual abuse of their children, Connie Ramirez, the CPS case worker for this case, testified that it would not be safe for the children to go back to live with their mother, even with their father now in prison:

> Q: So why can't the kids go home?
>
> A: I don't believe that Ms. Fox could be protective of the children, whether or not Mr. Fox is in the home. I don't think—her not understanding her daughter—not questioning more about what did she mean, you know—I don't think—I think it tells me a lot that her—that [J.C.F.] felt that she could trust the nurse and tell the nurse. I think it tells me a lot that [B.R.F.] would tell another child about her outcry as opposed to tell her mom. Because she couldn't be protective the first time.

Ramirez also testified that all three children are currently placed together "in a very strong foster home."

Special Advocate Krenek testified that she did not believe Ms. Fox should have a part in her children's lives anymore, because the children needed safety and permanency. She testified that in forming her opinion she considered that the children wanted to live with their mother but that, based on her interviews with the children, allowing them to have contact with their mother would not enable the children "to move on and properly adjust and be happy without the guilt of still having their mom in their life."

12

Family therapist Leslie Smith testified that the children needed to be in "a very loving, nurturing, caring environment, with some very consistent guidelines, very consistent and clear boundaries and expectations, with a very set schedule." She further testified that there was "a lot of inconsistency" in Ms. Fox's home and that the children would have a more stable home environment in foster care. Smith testified that, in her opinion, it would be in the best interest of the children to remain in permanent foster care and have some contact with their mother. Smith also testified that all of the children wanted to go home with their mother, and that they loved their mother, but that she did not believe Ms. Fox was capable of parenting her children.

School nurse Johanna Fite, to whom J.C.F. and B.R.F. had made outcries, testified that she had developed a close relationship with the children because they would frequently sit in her office and visit with her. Fite recounted that the children would frequently claim that they had not eaten breakfast and would have breakfast in her office.[3] Fite added that the children often appeared tired, unhealthy, and inadequately cared for; "[l]ike their hair would be brittle and their skin would not be real kept or just not real clean" and would have dirty clothes or no socks or underwear. Fite claimed that she and her mother had occasionally given clothes or shoes to the children. Photographs of the Foxes' home reveal clothing and other personal items strewn across the floors, holes in walls and floors, dirty dishes, and beds with no sheets.

Jacqueline Bradley, Fite's mother and the person who provided day care for the children, testified that Ms. Fox thanked her for making a report to CPS and that Ms. Fox was glad

---

[3] Fite also indicated that the children were disruptive in their classes and that, rather than taking disciplinary action, teachers would simply send the children to Fite's office at times when "the rest of the class needed to concentrate."

Bradley made the report "if it needed to be done." June Swenson, a youth counselor at the Family Crisis Center in Bastrop, testified that Ms. Fox enrolled B.R.F. in therapy because Ms. Fox was concerned about the possibility of her daughter harming herself.

Ms. Fox testified that she loved her children, wanted them to come home with her, and believed herself to be a good mother; however, she also acknowledged that her parenting skills needed improvement. Ms. Fox's sister, the children's aunt, also testified that she believed the children should be with their mother, because of the "strong bond" that Fox shared with her children.

Having reviewed the evidence, we conclude that the evidence is legally and factually sufficient to support the jury's finding that terminating Ms. Fox's parental rights was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 27. We overrule Ms. Fox's third and fourth issues.

## CONCLUSION

Having overruled Ms. Fox's issues on appeal, we affirm the judgment of termination.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: March 30, 2006

14