TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-05-00761-CV






Patricia Marie Fox, Appellant


v.


Texas Department of Family and Protective Services, Appellee







FROM THE COUNTY COURT AT LAW OF BASTROP COUNTY,

NO. 04-9222, HONORABLE BENTON ESKEW, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 Patricia Marie Fox appeals a judgment terminating her parental rights to three
children, daughters B.R.F. (born 1995) and J.C.F. (born 1998), and son B.J.F. (born 1997). For the
reasons stated below, we will affirm the judgment of the trial court. 


BACKGROUND

 The underlying facts center on the sexual abuse of the two daughters by Joe James
Fox III, the children's father and Patricia Fox's husband at the time, who subsequently pleaded guilty
to aggravated sexual assault, see Tex. Pen. Code Ann. § 22.021 (West 2003 & Supp. 2005), and
whose parental rights to all three children were terminated in a separate proceeding. Contending that
Patricia Marie Fox knowingly permitted or even condoned Mr. Fox's sexual abuse of his daughters,
the Department of Family and Protective Services brought the present proceeding to terminate Ms.
Fox's parental rights. 

 The trial court submitted to the jury, with respect to each child, the question: "Should
the parent-child relationship between Patricia Marie Fox and [the child] be terminated?" and
instructed the jury concerning two of the alternative statutory termination grounds: (1) whether
"Patricia Marie Fox knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endanger the physical or emotional well being of the children," see Tex. Fam.
Code Ann. § 161.001(1)(D) (West 2002 & Supp. 2005), and (2) whether "Patricia Marie Fox
engaged in conduct or knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional well being of the children." See id. § 161.001(1)(E). The court
further instructed the jury that to find termination, "ten or more of you must find that at least one of
the . . . grounds have been proven by clear and convincing evidence" and "[a]ll ten jurors must agree
on the same ground or grounds." The court also instructed the jury that "[i]n addition, it must be
proven by clear and convincing evidence that termination of the parent-child relationship would be
in the best interest of the children," and instructed the jury concerning various factors to consider in
determining best interest. 

 The jury found that Ms. Fox's parental rights to each child should be terminated, and
the trial court rendered judgment on that verdict. This appeal followed. 


DISCUSSION

 Ms. Fox brings four issues on appeal, asserting that: (1) the trial court violated her
due process rights by submitting the ultimate issues of termination in broad form; (2) the trial court
erred by permitting the State to waive opening statement--which, she contends, "impermissibly
allowed the burden of proof to be shifted to appellant"; (3) the evidence was not legally sufficient
to support the jury's findings regarding the two termination grounds or that termination was in each
child's best interest, see id. § 161.001(2); and (4) the evidence was not factually sufficient to support
the jury's findings. 

 We begin with Ms. Fox's first two issues. Her first issue regarding broad-form
submission of termination questions is controlled by Texas Department of Human Services v. E. B.,
802 S.W.2d 647 (Tex. 1990), in which the Texas Supreme Court squarely rejected the arguments
Ms. Fox makes here. In E.B., the Court approved submission of a single broad-form question
incorporating two statutory grounds for termination of parental rights submitted disjunctively,
holding that the "controlling question . . . was whether the parent-child relationship between the
mother and each of her two children should be terminated, not what specific ground or grounds
under [the statute] the jury relied on to answer affirmatively the questions posed." E.B., 802 S.W.2d
at 649; see also Taylor v. Texas Dep't of Protective and Regulatory Servs., 160 S.W.3d 641, 649 n.8
(Tex. App.--Austin 2005, pet. denied); In re J.M.M., 80 S.W.3d 232, 249-50 (Tex. App.--Fort
Worth 2002, pet. denied) (absent contrary evidence, we presume that jury followed trial court's
instructions that same ten or more of them must agree on verdict and all answers made). Unless and
until the supreme court tells us otherwise, we must continue to overrule these types of complaints. 
We overrule Ms. Fox's first issue. 

 In addition, we find nothing erroneous about the State's waiver of its right to give an
opening statement, much less any support for the proposition that this waiver somehow shifted the
burden of proof to Ms. Fox. Moreover, the trial court and the parties consistently emphasized to the
jury from voir dire through closing argument that the burden of proof rested on the State, and the jury
charge clearly articulated the same. (1) We overrule Ms. Fox's second issue. 


The evidence

 We now address Ms. Fox's third and fourth issues and consider whether the record
contains legally and factually sufficient evidence to support the jury's findings of each submitted
termination ground and best interest. 


 Standard of review

 In appeals of parental termination cases, we review the legal and factual sufficiency
of the evidence in a manner that accommodates the clear and convincing standard of proof that
governs such cases. See Tex. Fam. Code Ann. § 161.206(a); In re J.F.C., 96 S.W.3d 256, 264-65
(Tex. 2002); In re C.H., 89 S.W.3d 17, 26 (Tex. 2002). When reviewing the legal sufficiency of the
evidence to support a termination finding, we consider all the evidence in the light most favorable
to the finding to determine whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true. J.F.C., 96 S.W.3d at 266. In so doing, we presume that the
fact-finder settled disputed facts in favor of the finding if a reasonable fact-finder could do so. Id. 
We disregard all evidence that a reasonable fact-finder could have disbelieved or found incredible. 
Id.

 When reviewing the factual sufficiency of the evidence supporting a termination
finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's
finding, is such that a fact-finder could reasonably form a firm belief or conviction about the truth
of the allegations. C.H., 89 S.W.3d at 27-29. Further, we consider whether the disputed evidence
is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its
finding. J.F.C., 96 S.W.3d at 266. If the disputed evidence is so significant that a fact-finder could
not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.
Id.

 As with all sufficiency challenges, we begin with the jury charge. Osterberg v. Peca,
12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); Golden Eagle Archery, Inc. v. Jackson, 116
S.W.3d 757, 762 (Tex. 2003) (factual sufficiency); Ancira Enters., Inc. v. Fischer, 178 S.W.3d 82,
93 (Tex. App.--Austin 2005, no pet.). Consistent with section 161.001 of the family code, the
charge required the jury, in order to find that Ms. Fox's parental rights should be terminated as to
each child, to first find at least one of the two submitted statutory termination grounds, then to
determine that termination was in the child's best interest. See Tex. Fam. Code Ann. § 161.001(1)-(2). 


 Termination grounds

 As previously noted, the jury was instructed that it could terminate Ms. Fox's parental
rights if at least ten jurors agreed either (1) that Ms. Fox knowingly placed or knowingly allowed
each child to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, or (2) that Fox engaged in conduct or knowingly placed each child with
persons who engaged in conduct which endangers the physical or emotional well-being of the
children. See id. § 161.001(1)(D)-(E). Under subsection (D), the danger to the child results from
the child's environment, while under subsection (E), a person's conduct is the source of the danger
to the child. In re D.C., 128 S.W.3d 707, 715 (Tex. App.--Fort Worth 2004, no pet.); Robinson v.
Texas Dep't of Protective & Regulatory Servs., 89 S.W.3d 679, 686 (Tex. App.--Houston [1st Dist.]
2002, no pet.). Regarding both grounds, the jury was instructed that "[s]exual abuse is conduct that
endangers a child's physical or emotional well-being" and that "[t]he aggravated sexual assault of
a child in the home is conduct you may infer will endanger the physical or emotional well being of
other children in the home." See In re R.G., 61 S.W.3d 661, 667 (Tex. App.--Waco 2001, no pet.);
In re King, 15 S.W.3d 272, 276 (Tex. App.--Texarkana 2000, pet. denied). "Endanger" was defined
as "to expose to loss or injury, to jeopardize," and "[i]t is not necessary that the conduct be directed
at the child or that the child actually suffers injury." The jury was further instructed that
"knowingly" means "with knowledge, consciously, intelligently, willfully, intentionally," and "with
awareness of the nature of her conduct," and that "[p]arental knowledge that an offense has occurred
is not necessary . . . it is sufficient that a parent was aware of the potential for danger and disregarded
that risk." See In re A.B., 125 S.W.3d 769, 775 (Tex. App.--Texarkana 2003, pet. denied); In re
Tidwell, 35 S.W.3d 115, 118 (Tex. App.--Texarkana 2000, no pet.). 

 There is no dispute that Mr. Fox committed aggravated sexual assault against both
B.R.F. and J.C.F. Thus, whether the State established either termination ground turned on whether
there was clear and convincing evidence that Ms. Fox, at a minimum, knew of a risk that B.R.F. or
J.C.F. would be subjected to sexual abuse by their father and disregarded that risk. The State
presented several witnesses who testified that the children had divulged that Ms. Fox actually knew
about Mr. Fox's sexual abuse of B.R.F. and J.C.F., yet acquiesced in it. This testimony included: 



 Mindy Graber, a forensic interviewer for the Children's Advocacy Center who
interviewed all three children, recounted that then nine-year-old B.R.F. told her
that she had informed her mother about the abuse. She also testified that then
five-year-old J.C.F. told her that she had told her mother many times about the
abuse, and that her mother had even observed the abuse on one occasion:


 

 Q: And what, do you remember, did she say about mom in that interview? Did
she say anything about her?


 A: Well, when I first asked her she said--she said mom, no, she didn't see. 
And I didn't tell her. And then like a minute later she walked over to my
chair and she tapped my arm and she said, I'm sorry, I lied. And then said,
I told my mom I touched dad's weenie, were her words, and she said, I told
her lots of times. I don't remember how many times I told her. And when
I asked if she had ever seen them, she said that she saw her under the
blanket.


 Q: Who's she? I'm sorry?


 A: [J.C.F.] said that mom saw her in between his legs under the blankets and
[mom] said, "Awe, someone loves you."



 Officer Lee Nussbaum, an investigator with the Crimes Against Children
division of the Bastrop County Sheriff's Office, testified regarding his
investigation of the sexual abuse reports. Nussbaum observed Graber's
interviews with the children. He testified regarding B.R.F.'s statements to
Graber:


 

 She said when the abuse was occurring when she was five she had told her
mother what he had done to her, and she said that her mother yelled at Joe and
threw things at him. So that's why, according to her, she said that's why she
didn't tell mom about this time because mom wouldn't do anything but yell at
him and throw stuff at him. 



 Officer Nussbaum also reviewed J.C.F.'s videotaped interview with Graber and
testified regarding J.C.F.'s statements:


 

 Q: And so did [J.C.F.] indicate at all if mother knew?


 A: If the mother knew?


 Q: Do you know?


 A: J.C.F. stated she's told her mom several times. She states her mom says
that it is okay, and she states this is the truth.



 Johanna Fite, the school nurse at the elementary school that the three children
attended, testified regarding then five-year-old J.C.F.'s initial outcry to her and
the investigation that ensued after Fite reported the outcry to Child Protective
Services. During this investigation, B.R.F. also admitted to Fite that she had
been sexually abused. When Fite asked B.R.F. why she had not let her mother
know what was happening, B.R.F. told her "that she did, that nothing ever
happened, and that her mom would just get mad and yell and throw things at her
father." 

 Fite also testified that while B.R.F. was being questioned at the school by CPS,
she attempted to use Fite's telephone to call her mother. B.R.F. indicated that
she had been instructed to call her mother if the children were ever questioned
by CPS. Fite further recounted that before Mr. Fox's sexual abuse was revealed,
Ms. Fox had previously attempted to portray B.R.F. to her as a liar. From these
facts, Fite inferred that Ms. Fox had known of Mr. Fox's sexual abuse and was
anticipating the need to respond if B.R.F. ever disclosed the abuse to Fite or
others. 

 Leslie Smith, a licensed family therapist, testified that B.J.F., the girls' brother,
told her that he had seen his father in the bathroom touching his sisters and that
he told his mother about the touching. 

 Beth Nauert, a pediatrician who medically diagnosed the sexual abuse, testified
that J.C.F. told her that "Mommy knew" about the sexual abuse because she was
present in the bedroom one time when it happened. 

 Dr. Michael McNeil, a psychologist who interviewed the children, testified that
the children told him that their mother knew about the abuse. McNeil also
testified that B.R.F. told him that the abuse stopped for about a year because her
mother had discovered the abuse and confronted the father about it.




 On the other hand, there is also evidence in the record that Ms. Fox did not become
aware of the abuse until after the children's outcry and the subsequent investigation:



 During the investigation and at trial, Ms. Fox consistently denied having
knowledge of her husband's sexual abuse while it was occurring. 

 Ms. Fox testified that if B.R.F. had told her about the abuse, Ms. Fox "did not
understand what she was saying." 

 Officer Nussbaum testified that during his interview with Mr. Fox, Mr. Fox had
maintained that his wife was not aware that he was sexually abusing their
daughters. 

 Janice Evans, a friend of Ms. Fox, testified that she did not believe Ms. Fox
knew about the abuse.

 The Court-Appointed Special Advocate appointed to the case, Samantha
Krenek, admitted that when the children's attorney ad litem had brought B.R.F.
into the courtroom to discuss her upcoming testimony with her, with Krenek
present, B.R.F. had expressed reluctance to testify and even appeared to recant
her previous statements that her mother had knowledge of the abuse. 




However, Ms. Fox admitted to knowing facts that reasonable jurors could have viewed as warning
signs of possible child abuse. She acknowledged Mr. Fox's practice of having his daughters rub
lotion on his feet and bare back after he came home from work; Ms. Fox did not believe this was
inappropriate behavior. There is also evidence that Ms. Fox had caught Mr. Fox looking at child
pornography on his home computer. As for B.R.F.'s attempts to recant her accounts that her mother
knew about the abuse, Krenek suggested that B.R.F. had recanted because B.R.F. realized that the
only way to return home to her mother was to change her story. 

 Viewing this disputed evidence in the light most favorable to the jury's findings, we
conclude that a reasonable fact-finder could have settled the disputed facts in favor of the findings
and could have formed a firm belief or conviction that Ms. Fox, at a minimum, knew of a risk that
her children would be subjected to sexual abuse by their father and disregarded that risk. The
evidence is thus legally sufficient to support the jury's findings regarding child endangerment. See
Tex. Fam. Code Ann. § 161.001(1)(D)-(E); J.F.C., 96 S.W.3d at 266. We also find the evidence
factually sufficient to support these findings. Considering the evidence as a whole, the jury
reasonably could have reconciled the disputed evidence in favor of its finding and reasonably formed
a firm belief or conviction that Ms. Fox knew of a risk that her children would be subjected to sexual
abuse by their father. (2) See C.H., 89 S.W.3d at 27. 


 Best Interest


 The jury was instructed that "[s]ome factors to consider in determining best interest
are:


(1) the desires of the child or children; 


(2) the child's age and physical and mental vulnerabilities;


(3) the frequency and nature of out of home placements;


(4) the magnitude, frequency, and circumstances of harm to the children;


(5) whether the child has been the victim of repeated harm after the initial report
and intervention by the department or other agency;


(6) the results of psychiatric, psychological, or developmental evaluations of the
child, the child's parents, other family members or others who have access to
the home;


(7) whether there is a history of abusive or assaultive conduct by the child's family
or others who have access to the home;


(8) whether there is a history of substance abuse by the child's family or others
who have access to the home;


(9) the willingness and ability of the child's family to effect positive environmental
and personal changes within a reasonable period of time;


(10) whether the child's family demonstrates adequate parenting skills, including
providing the child and other children under the family care with:


 (a) minimally adequate health and nutritional care;

 

 (b) care, nurturance, and appropriate discipline consistent with the child's
physical and psychological needs;

 

 (c) guidance and supervision consistent with the safety of the child;

 

 (d) a safe physical home environment;

 

 (e) protection from repeated exposure to violence even if the violence is not
directed at the child; and

 

 (f) an understanding of the child's needs and capabilities. 



See Taylor, 160 S.W.3d at 646 (citing Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976))
(factors are not exhaustive and other factors may be considered when appropriate). The absence of
evidence about some factors will not preclude a fact-finder from reasonably forming a strong
conviction or belief that termination is in the child's best interest. C.H., 89 S.W.3d at 27. The sole
focus of our inquiry is the best interest of the child, not the parent. D.O. v. Texas Dep't of Human
Servs., 851 S.W.2d 351, 356 (Tex. App.--Austin 1993, no writ). 

 The evidence is legally and factually sufficient to support the jury's finding that
termination is in the best interest of the children. In addition to the evidence that Ms. Fox knew of
her husband's sexual abuse of their children, Connie Ramirez, the CPS case worker for this case,
testified that it would not be safe for the children to go back to live with their mother, even with their
father now in prison:


Q: So why can't the kids go home?


A: I don't believe that Ms. Fox could be protective of the children, whether or not
Mr. Fox is in the home. I don't think--her not understanding her daughter--not
questioning more about what did she mean, you know--I don't think--I think
it tells me a lot that her--that [J.C.F.] felt that she could trust the nurse and tell
the nurse. I think it tells me a lot that [B.R.F.] would tell another child about her
outcry as opposed to tell her mom. Because she couldn't be protective the first
time.



Ramirez also testified that all three children are currently placed together "in a very strong foster
home." 

 Special Advocate Krenek testified that she did not believe Ms. Fox should have a part
in her children's lives anymore, because the children needed safety and permanency. She testified
that in forming her opinion she considered that the children wanted to live with their mother but that,
based on her interviews with the children, allowing them to have contact with their mother would
not enable the children "to move on and properly adjust and be happy without the guilt of still having
their mom in their life."

 Family therapist Leslie Smith testified that the children needed to be in "a very loving,
nurturing, caring environment, with some very consistent guidelines, very consistent and clear
boundaries and expectations, with a very set schedule." She further testified that there was "a lot of
inconsistency" in Ms. Fox's home and that the children would have a more stable home environment
in foster care. Smith testified that, in her opinion, it would be in the best interest of the children to
remain in permanent foster care and have some contact with their mother. Smith also testified that
all of the children wanted to go home with their mother, and that they loved their mother, but that
she did not believe Ms. Fox was capable of parenting her children. 

 School nurse Johanna Fite, to whom J.C.F. and B.R.F. had made outcries, testified
that she had developed a close relationship with the children because they would frequently sit in her
office and visit with her. Fite recounted that the children would frequently claim that they had not
eaten breakfast and would have breakfast in her office. (3) Fite added that the children often appeared
tired, unhealthy, and inadequately cared for; "[l]ike their hair would be brittle and their skin would
not be real kept or just not real clean" and would have dirty clothes or no socks or underwear. Fite
claimed that she and her mother had occasionally given clothes or shoes to the children. 
Photographs of the Foxes' home reveal clothing and other personal items strewn across the floors,
holes in walls and floors, dirty dishes, and beds with no sheets. 

 Jacqueline Bradley, Fite's mother and the person who provided day care for the
children, testified that Ms. Fox thanked her for making a report to CPS and that Ms. Fox was glad
Bradley made the report "if it needed to be done." June Swenson, a youth counselor at the Family
Crisis Center in Bastrop, testified that Ms. Fox enrolled B.R.F. in therapy because Ms. Fox was
concerned about the possibility of her daughter harming herself. 

 Ms. Fox testified that she loved her children, wanted them to come home with her,
and believed herself to be a good mother; however, she also acknowledged that her parenting skills
needed improvement. Ms. Fox's sister, the children's aunt, also testified that she believed the
children should be with their mother, because of the "strong bond" that Fox shared with her children. 
 Having reviewed the evidence, we conclude that the evidence is legally and factually
sufficient to support the jury's finding that terminating Ms. Fox's parental rights was in the
children's best interest. See J.F.C., 96 S.W.3d at 266; C.H., 89 S.W.3d at 27. We overrule Ms.
Fox's third and fourth issues.


CONCLUSION

 Having overruled Ms. Fox's issues on appeal, we affirm the judgment of termination.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: March 30, 2006
1. Nor did the State's waiver of opening statement change the order of proceedings at trial--
the State was given the right to open and conclude the presentation of evidence and closing
argument. See Tex. R. Civ. P. 265, 266, 269. 
2. In the alternative, we hold that the evidence was legally and factually sufficient to support
the jury's findings regarding at least one of the two submitted termination grounds. Even if the
evidence was insufficient to support one of the grounds, the other ground, along with a finding of
best interest, would still support the verdict and judgment under the court's broad-form submission
of the controlling termination issue. Cf. In re J.F.C., 96 S.W.3d 256, 284 (Tex. 2002); Taylor v.
Texas Dep't of Protective and Regulatory Servs., 160 S.W.3d 641, 648 (Tex. App.--Austin 2005,
pet. denied).
3. Fite also indicated that the children were disruptive in their classes and that, rather than
taking disciplinary action, teachers would simply send the children to Fite's office at times when "the
rest of the class needed to concentrate."