

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00298-CV

## IN THE INTEREST OF R.M.V. AND E.V., CHILDREN

**From the 335th District Court
Burleson County, Texas
Trial Court No. 25,785**

## MEMORANDUM OPINION

Appellant R.V. appeals the trial court's order terminating his parental rights to his children, R.M.V. and E.V. We will affirm the trial court's termination order.

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Family Code, the Department of Family and Protective Services (the Department) must establish by clear and convincing evidence two elements: (1) that the parent did one or more acts or omissions enumerated under subsection (1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2011); *Swate v. Swate,* 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one

element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Swate,* 72 S.W.3d at 766. Due process requires the petitioner to justify termination of parental rights by "clear and convincing evidence." *Spangler v. Texas Dep't of Prot. & Reg. Servs.,* 962 S.W.2d 253, 256 (Tex. App.—Waco 1998, no pet.). This standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.*

In this case, the jury was charged with terminating R.V.'s parental rights on the grounds of Family Code subsection 161.001(1)(D) (knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being) and subsection 161.001(1)(E) (engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being). *See* TEX. FAM. CODE ANN. § 161.001(1)(D, E). The jury charge also stated that it must be proven by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children. Based on this charge, the jury found that the parent-child relationship between R.V. and R.M.V. and E.V. should be terminated. The trial court's order made an affirmative finding only on the subsection 161.001(1)(D) predicate violation.

In three issues, R.V. complains that: (1) the evidence is factually insufficient to support the finding against him on the subsection 161.001(1)(D) predicate violation; (2) the evidence is factually insufficient to support the finding against him on the subsection 161.001(1)(E) predicate violation; and (3) the evidence is factually insufficient

to support the finding that termination of his parental rights was in the best interest of the children.

## Preservation

We initially address the Department's assertion that R.V.'s factual-sufficiency complaints are not preserved because he did not file a motion for new trial asserting factual insufficiency. *See* TEX. R. CIV. P. 324(b)(2).

Until very recently, our precedent had been that, in termination cases, we could review a factual-sufficiency complaint on core issues (predicate violation or best interest) even though it was not preserved in the trial court. *See In re A.P.,* 42 S.W.3d 248, 254-56 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds by In re J.F.C.,* 96 S.W.3d 256, 267 n.39 (Tex. 2002); *see also In re T.N.F.,* 205 S.W.3d 625, 630 n.2 (Tex. App.—Waco 2006, pet. denied) (following *A.P.*). Then in *In re A.M.,* ___ S.W.3d ___, No. 10-12-00029-CV, 2012 WL 3242733 (Tex. App.—Waco Aug. 9, 2012, no pet. h.), we overruled *A.P.* (and *T.N.F.*) and held that, in termination cases, to raise a factual-sufficiency complaint on appeal, it must be preserved by including it in a motion for new trial. *Id.* at *2. But we also stated in *A.M.* that our decision to overrule *A.P.* (and *T.N.F.*) would only apply prospectively. *Id.* at *3.

R.V. did not file a motion for new trial; therefore, he did not preserve his factual-sufficiency complaints. Nevertheless, we will review R.V.'s factual-sufficiency complaints because R.V.'s opportunity to timely file a motion for new trial asserting factual insufficiency expired before our decision in *A.M.*

## Sufficiency

The standard of review for factual sufficiency in termination cases is well-established. *See In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002). In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*J.F.C.,* 96 S.W.3d at 266-67 (footnotes and citations omitted); *see C.H.,* 89 S.W.2d at 25.

We view the evidence in a neutral light when reviewing for factual sufficiency.

### The Evidence

Although unmarried, R.V. and C.M. had been together as a couple for approximately six years at the time of trial. Their son R.M.V. was born in September 2006; their daughter E.V. was born in April 2008.[1] R.V. testified that soon after E.V.'s birth, in June 2008, a 200-pound pallet was dropped on his foot at work, breaking it in about three places. R.V. was prescribed several medications for the injury, including pain medication. R.V. stated that he was not on medication before his foot injury and that since 2001 he had stopped drinking alcohol except for an occasional beer. After being unable to work for six months because of the injury, R.V. went back to work for

---

[1] C.M. has two other children who live with their fathers.

about four months before being laid off. R.V. then primarily stayed at home caring for R.M.V. and E.V. while C.M. worked.

C.M. testified that in June 2009, she was in a serious car accident that ruptured her spleen, shattered her hip, and broke her pelvis in seven places. R.M.V. and E.V. were at home with R.V. at the time. C.M. stated, "My right tire blew out, and I went end over end." C.M.'s injuries required two surgeries during which at least three plates and sixteen to seventeen pins were placed in her body. C.M. was prescribed a variety of medications following the surgeries, including pain medication. Several years before the car accident, C.M. had also suffered a work-related injury that continued to cause her pain and for which she was already prescribed pain medication.

R.V. testified that while C.M. was in the hospital recovering from the accident, he stayed by her side. During this time, R.M.V. and E.V. stayed with either his mother Frances or his sister Robbie. When C.M. was released from the hospital, her injuries were so significant that she and R.V. decided to live on property owned by R.V.'s mother. They set up a hospital bed in a trailer once used as a restaurant, located on the front of the property. Frances lived in a trailer behind the trailer where R.V., C.M., and the children began living and was there during the day. Robbie lived in a trailer just off to the side of the trailer where R.V. and C.M. began living. A sliding-glass door divided Robbie's living area from R.V. and C.M.'s living area.

R.V. testified that one evening the family was sitting down at the table eating dinner when C.M. started to go to sleep. R.V. took C.M. and put her in bed to let her sleep while they finished dinner. After dinner, the children then lay down, and R.V.

went to sleep as well. Frances then came in and found R.V. and C.M. sleeping. Frances testified that she was unable to wake R.V. or C.M., it startled her, and she called an ambulance. R.V. stated that Frances performed chest compressions on C.M. until an ambulance arrived. C.M. and R.V. were both taken to the hospital in separate ambulances. R.V. testified that he was awake and "fine" by the time he got to the hospital, so they let him go. Frances testified that the ambulance driver told her that R.V. was just "hard asleep." C.M., however, remained in the hospital for several days.

Tiffany Herbrich, who had been an investigator for the Department, testified that, on July 20, 2009, the Department received allegations of neglectful supervision and physical neglect of R.M.V. and E.V. by their parents. The specific allegations were that the car accident the month before had been caused by C.M. "being high on drugs" and that the parents had "overdosed for the second time." The allegations also included that the home had broken windows, that drugs were accessible to the children, and that human and animal feces were in the home. An on-call investigator was originally assigned to the case and responded. The investigator put into place a "safety plan." The safety plan required either Frances or Robbie to supervise all contact between the children and their parents.

Herbrich testified that she was assigned to the case a couple of days later. She met with the family at their residence. R.V. and C.M. told her that they both had suffered accidental overdoses. They told her that C.M. had overdosed because she had mixed medications prescribed by two different doctors. C.M. testified that she had taken Oxycontin that day for pain but then ran out of the medication and took a few

Vicodin pills. Herbrich testified that R.V. and C.M. told her that R.V. had overdosed because he had taken some of C.M.'s medication after being in pain. R.V. testified that he took his own prescription medication earlier in the day but that he ran out, so he took one of C.M.'s prescription pills. R.V. admitted that he should not have taken C.M.'s medication. Herbrich testified that R.V. and C.M. also told her about the car accident that C.M. was involved in the month before. C.M. said that it was just an accident and not any sort of suicide attempt. R.V. also admitted to Herbrich that he had suffered from some recent depression because he had been out of work for quite a while.

After Herbrich's visit with the family, the Department set up a family team meeting to try to figure out what services the family might need. At this family team meeting, both R.V. and C.M. agreed to drug testing and voluntarily signed medical releases for the different doctors that they were seeing so that the Department could send the medical records to its substance-abuse specialist and nurse consultant to determine if there was any prescription pain medication abuse. R.V. also agreed to contact the VA and get help for his depression.

Herbrich then investigated the allegations by contacting C.M.'s doctors. Herbrich discovered that on July 15, C.M. had called one of her doctors, reported that her medication had been stolen, and asked for more. The doctor told C.M. that he would need a police statement as proof that the medication had been stolen, but C.M. never provided the police statement to him. The doctor also told Herbrich that Oxycontin and hydrocodone are commonly prescribed together and were not a "fatal

mix" as claimed by C.M. C.M. testified, however, that her Oxycontin had been stolen, and when she talked to her doctor about it, he prescribed her a "lower amount" and then a "lower amount to it" until he was able to take her off of the medication. Furthermore, Herbrich testified that, in September 2009, the nurse consultant who had reviewed the medical records of the parents reported to Herbrich that she was not able to find any concrete evidence that the parents were abusing their pain medication and that she had no concerns that the parents were drug seeking or doctor shopping. The nurse consultant stated specifically that C.M.'s injuries from the car accident were very serious and very painful. It appeared that the amounts of pain medication C.M. was being prescribed were consistent with her injuries, and it did not appear that C.M. was trying to kill herself on the night that both R.V. and C.M. had to be taken to the hospital, but it rather was an accidental overdose from mixing two pain medications from two different doctors.

Herbrich also testified that it was never proven that C.M. was under the influence of some sort of drugs during the car accident, and C.M. was not cited or arrested for anything involving the car accident. Moreover, Herbrich stated that from her visits, she had never had any concerns as far as the home. She stated, "I have ruled out physical neglect each time, meaning I haven't found the broken glass, animal feces, anything of that nature, when I've gone to the home." The Department's case was thus closed on September 24, 2009.

Herbrich testified that four days later on September 28, 2009, the Department received more allegations regarding R.V.'s and C.M.'s care of their children, including the following:

- Law enforcement had been called out to the home after C.M. threw R.M.V. against the wall because she ran out of drugs.

- "A bunch of the family's dope fiend friends were at home."

- Law enforcement had been called out to the home because C.M. got upset when someone was trying to hot wire a car outside the home, and she went outside and fired gunshots. The children were awake when this occurred, and R.V. was inside the home, too high to get up.

- R.V. became angry at E.V. for running around while they were in public, so he "yanked her up," bruising her arm, and "beat her bottom repeatedly."

- Both R.V. and C.M. abuse prescription drugs on a daily basis, and C.M. obtains prescriptions from six different doctors in Houston.

- There were several dogs and cats that went inside the home, resulting in animal feces on the floor, which R.M.V. picked up.

Herbrich testified that she investigated these new allegations. She went back out to R.V. and C.M.'s home to meet with the family. Herbrich stated that she knocked on the door and could hear them inside, but they were saying to just go away. Herbrich left and called law enforcement. When she went back to the home with an investigator from the sheriff's department, R.V. and C.M. let her inside. Herbrich explained to R.V. and C.M. that although the Department had just closed their previous case, several new allegations had been made. Herbrich physically examined both of the children, but she found no marks or bruises on them. Herbrich stated that she also had no concerns about the house. Herbrich did not plan to remove R.M.V. and E.V. at that point.

Herbrich set up another family team meeting so they could all sit down at the CPS office and figure out what had happened. Herbrich testified that R.V. and C.M. said that law enforcement had come out to their home two times since the Department had closed its case. First, regarding the allegation that law enforcement responded to R.M.V. being thrown against the wall, C.M. denied harming R.M.V. and told Herbrich that she had only picked R.M.V. up and "lightly tossed him onto the crib." When C.M. demonstrated for Herbrich how she had done that, Herbrich explained to her that it was inappropriate but that it did not appear to be abuse.

R.V. explained the incident further, stating that Robbie, Robbie's daughter Heather, and C.M. were all arguing. Robbie got angry, said "I'm sick of all this," kicked the sliding-glass door, and, without intending to, broke the glass. When the glass shattered, Robbie exclaimed, "My God," and backed away to keep from getting cut. R.M.V., having heard the noise, then started walking toward Robbie to check on her. That is when C.M. grabbed R.M.V. and picked him up to keep him away from the glass. C.M. testified that Heather then ran off and called the police. Herbrich acknowledged that when law enforcement went out to the home that night, they did not find any marks or bruises on R.M.V. or any other evidence of abuse and that no charges were filed against C.M. for assaulting or injuring R.M.V.

Herbrich then testified that, regarding the allegation that law enforcement had been called out to the home because C.M. fired a gunshot, C.M. stated that she had fired a blank shot up in the air. C.M. testified that after R.M.V.'s birthday party, one of her girlfriends and her girlfriend's children decided to spend the night. That night, R.V.,

C.M., and the children were asleep in the house when she woke up to "a lot of screaming and hollering outside." When she got up and went outside, she saw a man named Anthony Harwell ripping the dash out of her girlfriend's car and Robbie, Heather, and the girlfriend screaming for him to stop and just leave. Harwell was trying to hot wire the car. C.M. stated that she told Harwell that he needed to leave the property. Harwell refused. C.M. then said, "[I]f I have to, I know I can make you leave this property." Harwell replied, "I don't have to leave this property. You can't make me." C.M. then said, "Yes, I can," went into Frances's trailer, got her pistol that had blank rounds in it, took the gun outside, and fired it one time up into the air. Harwell took off running while C.M. waited for the police to arrive. When the police arrived, they took the gun and informed her that they would be arresting Harwell because of other problems they had had with him. R.V. added that he and the children were inside the home sleeping when he heard the gun fire. R.V. stated that he opened the door, looked out, and asked what was going on. Someone replied that C.M. had just fired a gun off in the air. He then decided that he was going to stay out of it and went back inside.

Herbrich testified that she also went to speak with Harwell at the jail to get his side of the story. Harwell did not take responsibility and told Herbrich that C.M. had asked her to hot wire the girlfriend's car. Herbrich also spoke to the officer who responded that night, and he indicated that C.M. was slurring her speech, that he could not understand her, and that she appeared to be under the influence of something. Herbrich acknowledged, however, that C.M. was not arrested for anything that night.

R.V. and C.M. both testified that Heather admitted to them that she was responsible for the several allegations the Department received just after it had closed its previous case. The calls were made by friends of hers. C.M. testified that Heather told her she was sorry that she had done it and did not mean it. Herbrich testified that two of the allegations also came from Harwell's mother and grandmother. Herbrich explained that they do not know or investigate the motivation of those who make the allegations before opening an investigation.

Herbrich testified that the Department had a Family-Based Safety Services (FBSS) worker present at the family team meeting, and the Department wanted the family to go to FBSS. The Department offered R.V. and C.M. the services, such as parenting classes, counseling, and drug treatment. Herbrich then stated that with FBSS, there is usually a "safety plan" in which the children are supervised by someone else. In the previous case, Frances and Robbie had supervised the contact with the parents; however, because law enforcement had been called out to the house twice since the previous case had been closed, and Frances and Robbie had been in the home, the Department did not feel like any of the adults who had been used before were appropriate to supervise the children. Thus, the Department asked R.V. and C.M. to provide names of individuals with whom the children could be placed other than Frances or Robbie. At that point, R.V. said, "I will either kill myself, or I'll go to prison for killing someone else if you take my kids." The Department then decided to remove the children from R.V. and C.M. Herbrich stated that R.V.'s statement was deemed to be a threat or risk to both him as well as the children. The Department removed R.M.V.

and E.V. from R.V. and C.M. on October 2, 2009, and they were placed with a foster family.

Kristen Weaver became the caseworker in December 2009.[2] Weaver testified that the family plan of service had been put into place when she was assigned the case, but there had been a delay in getting some of the services started, so she worked to get those set up. The permanency goal at that time was family reunification.

In March 2010, Paul Johnson, a licensed professional counselor, began working with R.V. and C.M. Johnson testified that he saw C.M. about three sessions per month. He saw R.V. at least one session per month and, depending on R.V.'s work schedule, two times per month. R.V. testified that at some point, he began working on oil rigs where he would work for two weeks straight before returning home for a week. He earned $21 per hour working on the rigs, which was more than any local job offered.

Johnson testified that in counseling R.V. and C.M., he wanted to first identify the difficulties that got them involved with CPS. Johnson then wanted to look at the relationship dynamics between R.V. and C.M. and also spend some time talking about parenting strategies, stress management, and substance abuse. The goal was that the parents would develop improved mental health and behavioral decisions.

Regarding C.M., Johnson testified that they talked about parenting and setting limits. C.M. has a chronic pain condition due to the car accident; therefore, Johnson worked to help her manage some of the symptoms that are related to that physical

---

[2] There had been a different caseworker in the interim, but she did not testify.

health condition. Johnson and C.M. also discussed communication strategies with R.V. and how to make good decisions with respect to social contacts.

Regarding R.V., Johnson testified that they initially focused on R.V.'s relationship issues, specifically how he communicated with C.M. Johnson said that R.V. seemed to be "a pretty patient person," but he had a tendency to get easily exasperated and frustrated with C.M. Johnson also talked with R.V. about parenting, his connectedness to his children, and his decision-making related to that. R.V. seemed to be someone who was very caring and committed to his children. He was responsive to suggestions that Johnson made regarding life issues in general, as well as parenting specifically. R.V.'s parenting approach and views were appropriate. Johnson did have concerns about the long hours that R.V. was working and the fact that R.V. reported that he was having sleep problems because of that. Johnson stated that he thought R.V. had more difficulty with sleep than most of the people that he had encountered even though Johnson had worked with people who worked in the oilfield before. Johnson acknowledged that when someone has difficulty sleeping, it is possible that he or she suffers from exhaustion, which could lead to passing out or falling asleep.

Weaver testified that, in addition to the counseling, R.V. and C.M. completed parenting classes in satisfaction of the family service plan. R.V. and C.M. also took multiple drug tests in several different forms. All but one of the tests was negative, but Weaver stated that she had an issue with the tests. The service plan required C.M. and R.V. to keep up with all their prescription medications, to take the medications according to the recommended amount, and to inform the caseworker of any changes in

medication. Weaver stated that she did not understand how R.V. and C.M. could be taking their prescription medications as prescribed and still have negative screenings.

On the other hand, Weaver also stated that at times throughout the case, R.V. told her that he had stopped taking his medication, and Weaver admitted that it was unclear to her when he was and was not on his medication. Furthermore, Weaver acknowledged that it would have been an appropriate decision by R.V. if he decided to only take his pain medication when he was hurting. When R.V. was questioned about the drug tests, he testified that he could not explain why the drug screenings did not show positive for any of the medications he was supposed to be taking; however, he was not taking his medications daily because he was working with a lot of dangerous equipment on the oil rigs.

Weaver testified that she also observed many visits between the parents and children during this time. She stated that the children were healthy kids who were pleased to be with their parents. The interaction between the parents and children was always appropriate. By September 2010, the family had begun having some unsupervised visitation. Weaver felt like there had been progress made. Johnson also testified that although it was not as rapidly as he would have liked, he also felt like R.V. and C.M. were making progress. In early October 2010, R.M.V. and E.V. were thus returned to R.V. and C.M. under a monitored return that was to last six months.

Johnson testified that the family was definitely moving forward when the children were returned. The parents were structuring things in terms of how time was spent with the kids and how the tasks were divided up in the home. The parents were

communicating better with one another. C.M. in particular was implementing things that Johnson had suggested.

Johnson stated that he did have some family counseling sessions with C.M. and the two children together. At those times, R.V. was not available because he was out of town at work. One of the last sessions he had, however, was with R.V. and R.M.V. together. Johnson stated that there seemed like a "pretty comfortable attachment" between R.V. and R.M.V. R.M.V. seemed connected to his dad and "revved up" about being with him. That showed to Johnson that the relationship mattered to R.M.V. Johnson stated that, based on that counseling session, it would not be in R.M.V.'s best interests to terminate the relationship. But Johnson did say that although he never saw any actual dangers when the parents and children were in counseling together, there was an issue with the parents' ability to anticipate dangers. Johnson explained:

> Well, even within the context of my office, for example, that there might be dangers of kids climbing on things and kids playing with particular toys, kids throwing things, those sorts of things, that -- kind of failing to see what the end result of that might be.
> And so you can take something like that and magnify it across, you know, a household with many more rooms and many more things to get into. So I guess failure to anticipate dangers.

Johnson stated that R.V. and C.M. were just beginning to improve with this issue. They were aware of the seriousness of the situation. But Johnson also testified that it was fair to say that in their March to December 2010 counseling sessions, R.V. and C.M. should have had the time to recognize and begin resolving the problems in their lifestyle that would prevent another removal of the children.

Weaver testified that she made at least ten visits to the home after the children were returned, some announced and some unannounced. She stated that there were some concerns during the visits. On one occasion, she was able to have about a thirty-second conversation with R.M.V. outside before R.V. opened the door, saw who was there, and allowed her inside. Weaver felt it was unsafe for R.M.V. to be unsupervised for that length of time because someone could have taken him and left. Weaver acknowledged, however, that she could not be certain that R.V. was not watching from inside. Weaver also stated that during one visit or possibly the same visit, both of the children were outside playing in the front yard with socks on but no shoes. There was a fence around the yard and toys for the children to play on inside the fence, but Weaver did not think it was a safe situation for R.V. to be inside while the children were outside. There was also a morning when Weaver visited, and the children were "filthy." On another occasion, C.M. was at the home but the children were not. The children were at Frances's home, and one of the stipulations of the monitored return was that the children were not to be unsupervised with Frances.

Evelyn Faye Lane, the court-appointed special advocate (CASA) and guardian ad litem for R.M.V. and E.V., testified that she also visited with the parents and children together four times during the monitored return. She also had concerns during her visits. R.M.V. made negative comments more than once about how his parents were getting along. R.M.V. was very upset when C.M. was not there. Several times, he said, "She's not here. She's not coming back. Mommy's not here. She's not coming back." During one home visit, R.M.V. had a cut and bruise around his eye. When she asked

him how he had gotten hurt, he said that he could not talk to her about it. Lane also stated that she smelled alcohol on C.M.'s breath more than once. C.M. denied having been drinking or having alcohol on her breath when Lane or Weaver made home visits.

Tim Davis, a sheriff's deputy, testified that, on December 15, 2010, sometime between 9:00 and 10:00 p.m., he received a radio transmission that two people were "passed out" in a car in the parking lot of Suzy's Bar and Grill. When Davis arrived at the scene, he saw a black four-door car parked in front of the establishment and someone outside, pointing to the car, saying, "That's it." Suzy's Bar and Grill was open at that time, and there were other vehicles in the parking lot. Davis positioned his vehicle behind the black car and activated his in-car video.[3] Davis then approached the black car and found R.V. and C.M. "passed out in the front seat of the car" and R.M.V. and E.V. "up and about in the back seat." The car was not running, the keys were not in the ignition, and the windows were closed.

Davis initially got the two children out of the back seat of the car. The children were not restrained. He could not recall if there were any children's safety seats in the vehicle. Davis stated that the children did not appear to be in any distress.

When Davis opened the door, the light came on inside the car, but it had no effect on either parent. Davis then called out to R.V., "Sir, can you hear me? I need you to go ahead and let me see your hands." When R.V. did not respond, Davis went to the passenger's side and addressed C.M. She did not respond either. Davis had to physically shake C.M. in the passenger's seat to get her to wake up. DPS Trooper

---

[3] The video was not admitted into evidence.

Insminger had arrived and also had to physically shake R.V. to get him to wake up. Frances testified that R.V. is deaf in one ear and that he "sleeps hard." Davis was not aware that R.V. was deaf in one ear.

After waking C.M., Davis told her to get out of the vehicle. She attempted to get out once, but he had to help her out and stand her up. After he stood her up, he let her go, and she almost fell down several times while he was trying to get her identification. Davis could tell that C.M. was "fairly incoherent." Her speech was slurred. She could not answer his questions directly or in a proper manner. He shined his flashlight into her eyes, and her pupils did not react like they were supposed to. "They were very pinpoint." He did not smell any kind of alcoholic odor emitting from her, but he knew she was impaired by something. R.V. was also assisted out of the vehicle by Trooper Insminger. Davis stated that the degree of impairment between R.V. and C.M. was "[q]uite similar." Both R.V. and C.M. were placed in Trooper Insminger's vehicle and taken to the jail. The children were released to either their grandmother or their aunt.

Davis testified that there was trash everywhere in the vehicle. There was food that had just been picked up from Suzy's Bar and Grill in the backseat with the children. Davis located a purse in the passenger's side of the vehicle and saw an unlabeled medicine bottle in it. The bottle was completely full with different types of pills, later determined to be Xanax, an antianxiety pill, and hydrocodone. Trooper Insminger found a medicine bottle in R.V.'s pocket with the same several medicines in it. All the identifiers had been scratched off the bottle in R.V.'s pocket except for the name of the prescribed medication. Davis filed a complaint for possession of controlled substance,

penalty group 3, against C.M. and two complaints (possession of controlled substance, penalty group 3, and possession of controlled substance, penalty group 4) against R.V. Davis did not investigate whether C.M. or R.V. actually had legitimate prescriptions for these drugs.

Weaver testified that she, her supervisor, and the CASA supervisor visited with R.V. and C.M. at the jail. They asked the parents what happened that night, and R.V. told them that he fell asleep in the front seat of the car. Weaver stated, however, that the officers did not think that R.V. was just asleep in the car that night; he may have been under the influence of something. R.V. testified at trial that earlier on that day, he had taken a pain pill because his back was hurting from riding in a car for eight hours. He also stated that he took a Tylenol PM before going to Suzy's Bar and Grill because he had a headache and had driven all day that day.

Both R.V. and C.M. were indicted for abandoning or endangering a child based on the incident at Suzy's Bar and Grill. When R.V. was asked if he had a drug problem during the time that the removals took place, R.V. replied, "I think it probably was starting to progress that way, yes." Also, when R.V. was asked if the charge in the indictment was for abandoning or endangering a child, the same as C.M., R.V. replied, "Yes." He then stated, "In answer to that, I've been advised by my attorney, since the case has not been issued, that I need to take the Fifth on all questions pertaining to that." C.M. also pleaded the Fifth Amendment when asked several questions about the incident at Suzy's Bar and Grill.

Weaver, her supervisor, and the CASA supervisor told R.V. and C.M. that the Department's position had changed and that it was now going to go forward with termination. The children were removed for the second time and placed back in the same foster home. When the children were being removed, R.M.V. was very reluctant to leave and very upset for about an hour or two afterward but then readjusted. The foster mother reported to Weaver that E.V. had been potty-trained when she had left for the monitored return, but when she was brought back to the foster home, diapers were sent for her. At the time of trial, E.V. was still struggling with being potty-trained again.

R.V. denied that his mother Frances ever monitored his medication, but C.M. testified that after the children were removed the first time, Frances monitored their medication when it needed to be. C.M. stated, "And, you know, we thought we could do it ourselves, and obviously we messed up on it, and that's why the children got removed the second time." Frances testified that she had taken the pills and put them up so that they would not be left on the bedside table where the children could get them but that R.V. and C.M. knew where the pills were and could have gotten them anytime. When R.V. was asked what has now changed with him so that he will not have another relapse, he replied that he had not taken medication in almost six months.

*Subsection 161.001(1)(D) Predicate Violation*

Subsection 161.001(1)(D) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions

or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D).

To endanger means to expose to loss or injury, to jeopardize. *Texas Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533.

> When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

> It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by ... leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re C.W., Jr.*, No. 14-09-00306, 2009 WL 4694946, at *6 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

R.V. argues that the verdict was contrary to the overwhelming weight of the evidence because the Department did not even argue to the jury that the conditions in which the children lived endangered them. To support this proposition, R.V. points out that the Department's own evidence established that there were no concerns with R.V.'s and C.M.'s residence. But even though the focus of subsection 161.001(1)(D) is on the child's environment, and we recognize that the Department did present testimony that there were no concerns with the home itself, courts have held that parental conduct itself may produce an endangering environment. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child."); *see also In re D.R.J.*, No. 07-08-0410-CV, 2009 WL 1953402, at *3 (Tex. App.—Amarillo Jul. 8, 2009, pet. denied) (mem. op.; "Although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering 'environment.'").

In this case, R.V. testified that in July 2009, he accidentally overdosed when he took one of C.M.'s prescription pills after he had taken one of his own prescription medications earlier in the day. R.V. admitted that he should not have done this, calling it "stupid." In December 2010, however, the young children were left unsupervised in the backseat of a car in a restaurant parking lot when R.V. and C.M. once again became

impaired, and there is ample evidence that R.V.'s impairment on this occasion was again caused by his knowing misuse of medication. Notably, Trooper Insminger found a medicine bottle in R.V.'s pocket with prescription medications in it. And when testifying about his indictment for abandoning or endangering a child, R.V. stated, "In answer to that, I've been advised by my attorney, since the case has not been issued, that I need to take the Fifth on all questions pertaining to that." *See In re C.J.F.*, 134 S.W.3d 343, 352-53 (Tex. App.—Amarillo 2003, pet. denied) ("A jury may draw an adverse inference against a party who pleads the Fifth Amendment.").

We thus hold that the evidence is factually sufficient to allow the jury to form a firm belief or conviction that, under subsection 161.001(1)(D), R.V. knowingly placed or knowingly allowed R.M.V. and E.V. to remain in conditions or surroundings that endangered their physical or emotional well-beings. We overrule R.V.'s first issue. Having overruled R.V.'s first issue, we need not reach his second issue. *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.) ("If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights.").

### *Best Interest of the Child*

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these

individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.*

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Texas Dept. of Prot. & Reg. Servs.,* 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable permanent home for a child is a compelling state interest. *Id.* at 87.

*Desires of the child:* There is no direct evidence of R.M.V.'s and E.V.'s desires. As R.V. points out in his brief, Weaver testified that she believes the children's desires should not be a factor in determining their best interests. She did not ask R.M.V. and E.V. if they wanted to go home because "a four-year-old and a three-year-old aren't capable of making the best decisions for themselves, which is why there's an agency in place like this, to help make those decisions for them."

The circumstantial evidence regarding the desires of the children is conflicting. There is evidence that the children are bonded to their parents as well as to the foster home. Thus, this factor weighs neither in favor of nor against the best-interest finding.

*The child's emotional and physical needs now and in the future and the emotional and physical danger to the child:* Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams,* 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns,* 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."). Often, the best interest of the child is infused

with the statutory offensive behavior. *In re W.E.C.*, 110 S.W.3d 231, 240 (Tex. App.— Fort Worth 2003, no pet.). Parental knowledge of the occurrence of an actual offense that endangers a child's emotional or physical well-being is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded the risk. *In re R.G.*, 61 S.W.3d 661, 667-68 (Tex. App.—Waco 2001, no pet.), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d 256.

We discussed the danger to the children above. Weaver also testified that she believed termination is in the best interests of the children because the parents had an incident that was very similar to the one that they had back in July 2009. She stated that although the children were not injured, the Department had concerns that the parents were not taking their medications properly, resulting in them passing out, overdosing, or being incoherent with two young children present. At Suzy's Bar and Grill, the children could have gotten out of the car or someone could have gotten in the car and gotten them.

The evidence on these factors, including the statutory offensive behavior, weighs in favor of the best-interest finding.

*Parental abilities and available programs:* R.V. states that his abilities were shown by the condition of the children before removal; the opinion of the counselor that he was "patient," "caring" and committed to his children and had an appropriate attitude; and the fact that the Department did not claim that either his or C.M.'s interactions with the children were inappropriate. But as the State points out, there is evidence that the children regressed in their behavior during the monitored return to R.V. and C.M. The

foster mother reported that E.V. had been potty-trained when she had left for the monitored return, but when she was brought back to the foster home, diapers were sent for her, and, at the time of trial, E.V. was still struggling to be potty-trained again.

Johnson also testified that although R.V. and C.M. were attending counseling and making progress, it was not as rapidly as he would have liked. Johnson said that there was an issue with the parents' ability to anticipate dangers. This issue seems apparent in the circumstances Weaver encountered in her visits to the home during the monitored return where on at least one occasion, the young children were outside unsupervised. On another occasion, the children were "filthy." And the incident at Suzy's Bar and Grill that led to the second removal reflected on R.V.'s parental ability.

The evidence on these factors weighs in favor of the best-interest finding.

*Plans for child and stability of the home:* The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.,* 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc). The goal of establishing a stable permanent home for a child is a compelling state interest. *Dupree,* 907 S.W.2d at 87.

The Department's plans for the children were to place the children for adoption. R.V.'s plans were for the children to finish school. He hoped to change jobs for the children so that he would be home more often. He planned to buy a new house once he has paid off all the bills he has now, and he pointed to the extended family that is involved in his life.

The jury was free, however, to reject these assertions of future stability,

particularly given R.V.'s history of instability. *See In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) ("Ms. Woods has failed to show that she is stable enough to parent B.S.W. for any prolonged period. The trial court was entitled to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption."). R.V. has not had a valid driver's license since 2003 although he testified that he would take the children to the hospital even if it meant driving illegally. And there is evidence that R.V.'s inability to manage his medication resulted in the children being removed from his home, returned after a period of time, and then removed again.

The evidence on these factors thus weighs in favor of the best-interest finding.

*Acts or omissions and any excuses for them:* The Department points again to R.V.'s misuse of his medications. The evidence on these factors weighs in favor of the best-interest finding.

In conclusion, viewing all the evidence in a neutral light in relation to the *Holley* factors, we hold that the jury could have reasonably formed a firm belief or conviction that termination was in R.M.V.'s and E.V.'s best interests. Accordingly, the evidence is factually sufficient on the best-interest finding. We overrule R.V.'s third issue.

We affirm the trial court's termination order.


REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
        (Chief Justice Gray concurring with a note)*
Affirmed
Opinion delivered and filed October 4, 2012
[CV06]

\*        (Chief Justice Gray concurs in the judgment to the extent that it affirms the trial court's judgment.  He joins no part or portion of the Court's opinion.  He notes, however, that the standard of review in a case wherein the burden of proof at trial is clear and convincing, in particular appeals of the termination of parental rights, does not involve a review of the evidence in a "neutral light" as expressed on page 4 of the opinion and in the conclusion as expressed on page 28 of the opinion.  The Texas Supreme Court was very specific in expressing not only the standard of review, but in also expressly rejecting all other articulations, when it stated:  "But in the interest of uniform decision-making, we reject any articulation of the standard that varies from the standard we announce today." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  I am uncertain why this Court would express the standard of review in any language other than that of the Texas Supreme Court when it stated:  "We hold that the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* at 25.  In the dissenting opinion in *In re M.A.H.*, Chief Justice Gray explains the distinction between the Supreme Court's articulation of legal and factual sufficiency review in this type of appeal and no useful purpose is served by reexamining that issue or trying to change or rearticulate the standard in this appeal.  *In re M.A.H.*, No 10-02-00234-CV, 2004 Tex. App. LEXIS 6913, \*15-18 (Tex. App.—Waco, July 28, 2004, no pet.) (Gray, C.J., dissenting).  And, moreover, appellant failed to preserve any of the three issues raised on appeal.  *See In re A.M.*, __ S. W. 3d __, No. 10-12-00029-CV, 2012 Tex. App. LEXIS 6705, \*21-24 (Tex. App.—Waco, Aug. 9, 2012, no pet. h.)(Gray, C.J., concurring).  Because none of appellant's issues are preserved for our review, he would overrule each issue and, therefore, concurs in affirming the trial court's judgment.)